The Trustees of the Exempt Firemen's Benevolent Fund of the City of New York, Respondent, *v.* A. P. M. Roome, Appellant.

The provisions of the acts incorporating plaintiff (§ 7, chap. 633, Laws of 1866, as amended by chap. 962, Laws of 1867, chap. 297, Laws of 1870, chap. 64, Laws of 1877, and chap. 89, Laws of 1879), requiring the agents of foreign fire insurance companies doing business in the city of New York, to pay to it a percentage upon the gross premiums received by them for insurance upon property in that city, is not violative of the

provision of the State Constitution (Art. 3, § 18), prohibiting the passage by the legislature of " a private or local bill  \*   \*   \*   granting to any private corporation  \*   \*   \*   any exclusive privilege, immunity or franchise whatever ; " as the said provision grants no franchise or immunity or any " *exclusive* privilege."

The said provision is not in conflict with the prohibition in said Constitution (Art. 8, § 10) against giving " the money of the State  \*   \*   \*   to or in aid of any association, corporation or private undertaking." Conceding the money so directed to be paid to be " money of the State," (as to which *quære*,) it is not given but is directed to be paid in discharge of a moral obligation resting upon the State, and the appropriation of the money is to a public use, the plaintiff being simply a subordinate governmental agency employed by the State to fulfill its obligations.

The State may recognize and discharge an obligation due from it, by taking money from its treasury and giving it to a corporation for the relief of those to whom the obligation is due.

The percentage so required to be paid by said companies is in the nature of a license fee, or condition ; and the provision, therefore, is not repugnant to the constitutional requirement (Art. 3, § 20) that an act which " imposes, continues or revives a tax shall distinctly state the tax and the object to which it is to be applied."

The fact that the Act of 1879 (Chap. 89, Laws of 1879), amending said provision, is not certified to have been passed in either house of the legislature when a *quorum* of three-fifths of its members was present, as is required by the Constitution (Art. 3, § 21), on passage of an act " which makes, continues or revives any appropriation of public or trust money," does not affect the validity of the present appropriation, as it was made by the amendatory act of 1877 (Chap. 64, Laws of 1877), which has the proper certificate; the act of 1879 simply makes plaintiff the sole recipient and so is not a three-fifths bill.

Also *held,* that said provision was not repealed by the act providing for the taxation of certain corporations (Chap. 542, Laws of 1880, as amended by chap. 361, Laws of 1881) ; that, assuming the provision imposes a tax, it is one of a special and peculiar character, not a general tax for State purposes.

The history of the New York city fire department given.

(*Argued June 20, 1883 ; decided October 2, 1883.*)

Appeal from judgment of the General Term of the Supreme Court, in the first judicial department, in favor of plaintiff, entered upon an order made March 20, 1883, which directed judgment on a case submitted under section 1279 of the Code of Civil Procedure.

The defendant was agent in the city of New York for certain foreign fire insurance companies. He rendered to plaintiff's treasurer an account of gross receipts by him as agent during the year 1881, for premiums for insurance by said companies on property in the city of New York. The question presented was whether defendant was liable to pay to plaintiff two per cent on such gross receipts, as required by its charter and the various acts amendatory thereof which are set forth in the opinion.

*Joseph H. Choate* for appellant. It was not a proper exercise of legislative power to make the tax imposed payable directly to the plaintiff corporation. (Laws of 1871, chap. 888, § 5; *Philadelphia Ass'n* v. *Wood*, 39 Penn. St. 73; Cooley on Taxation, 89; *Weismer* v. *Vil. of Douglas*, 64 N. Y. 92; *Town of Guilford* v. *Sup'rs of Chenango Co.*, 13 id. 143; *Wallack* v. *Mayor, etc.*, 3 Hun, 84; 67 N. Y. 23.) The constitutional amendments of 1875 imposed such restrictions upon the legislature as invalidate the act of 1879. (Constitution, art. 8, § 10; id., art. 3, §§ 18, 20, 21.) A tax imposed upon the agents of a foreign corporation for public revenue, as distinguished from regulation of its own business, is to be regarded in all respects as ordinary taxation. (Cooley on Taxation, 403, 408, 409.) The act of 1879 was a local act. (*McConvill* v. *Hills*, 35 N. Y. 449; *Pultman* v. *Mayor*, 54 Barb. 169; *Gaskin* v. *Meek*, 42 N. Y. 186; *People, ex rel. Lee*, v. *Supv'rs*, 43 id. 10; *Gordon* v. *Comm'rs*, 47 id. 608; *Huber* v. *People*, 49 id. 132; *Matter of Volkening*, 52 id. 650; *Harris* v. *The People*, 59 id. 599; *People, ex rel. Hayden*, v. *Rochester*, 50 id. 525; *Matter of Vil. of Middletown*, 82 id. 196.) The act of 1879 is invalid under the twenty-first section of the third article of the Constitution, because, being an act which imposes, continues or revives a tax, or which continues or revives an appropriation of public money, three-fifths of all the members elected to either house not appearing to have been present. (*People, ex rel. Purdy*, v. *Commissioners*, 54 N. Y. 276; Laws of 1879, p. 136.) The tax, though imposed in form upon the

agent, is in truth a tax upon the corporation, and is for the State purposes. (*O'Meara* v. *The Mayor*, 1 Daly, 425; *Mayor* v. *Bailey*, 3 Hill, 531; *Donovan* v. *The B'd of Education*, 85 N. Y. 117; *Maximilian* v. *Mayor*, 62 id. 160, 167-170.) Defendant has been exempted from payment of the tax by chapter 542, Laws of 1880, as amended by chapter 361, Laws of 1881. (Supreme Court, General Term, *People* v. *Commissioners of Taxes*, decided January 18, 1882; Second Department, General Term, *People* v. *Davenport*, *People* v. *Trustees of New Rochelle.*)

*James C. Carter* for respondent. The restrictions of the Constitution in cases of any doubt should not be so interpreted as to invalidate legislation such as that now in question, which was never animated by other than public motives and purposes. (*Matter of Gilbert El. R. R.*, 70 N. Y. 361, 367; *People* v. *Albertson*, 55 id. 50, 54; *People* v. *Briggs*, 50 id. 553; *Adams* v. *Howe*, 14 Mass. 340, 345; *People* v. *Supv'rs of Orange*, 17 N. Y. 235, 241; *Warner* v. *Beers*, 23 Wend. 102, 166.) The circumstances that the corporation is wholly under the control of the legislature, and that it can never assert, as against the State, any right growing out of contract are decisive that it is a public corporation. (Angell & Ames on Corporations, §§ 30-36; *Dartmouth College* v. *Woodward*, 4 Wheat. 636; *Trustees of the University* v. *Winston*, 9 Ala. 17.) License fees, fines, penalties, etc., not the product of ordinary taxation, and which have never reached the treasury of the State, are not the money of the State within the meaning of section 10 of article 8 of the Constitution. (3 R. S. [6th ed.] 974, 975; 2 id. [6th ed.] 933.) If such moneys were the moneys of the State, such a disposition of them as is made by the legislation under review would not be a gift within the meaning of the same restriction. (*Guilford* v. *Supv'rs of Chenango Co.*, 13 N. Y. 149; *People* v. *Lawrence*, 6 Hill, 244; *Morris* v. *People*, 3 Denio, 381; *People* v. *Dinsmore*, 1 T. & C. 280; *Litchfield* v. *Vernon*, 41 N. Y. 123; *Wallack* v. *The Mayor*, 3 Hun, 84.) The words "tax" and "appropriation," as used in sec-

tions 20 and 21 of article 3 of the Constitution, refer to the system of State finances. "Tax" embraces only such taxes as are assessed, levied and paid in the ordinary manner into the treasury of the State, and "appropriation" refers only to the legislative disposition of the moneys thus collected. (*People, ex rel. N. Y. & H. R. R. Co.* v. *Havemeyer,* 47 How. Pr. 494, 510; *Town of Guilford* v. *Supv'rs of Chenango,* 13 N. Y. 143; *Darlington* v. *Mayor,* 31 id. 164, 185.) These charges upon insurance agents are not "taxes," as that word is commonly understood, nor in the sense in which it is used in the Constitution. They are fees paid for the privilege of carrying on business of a certain description. (*Walker* v. *City of Springfield,* 10 Rep. 458; *People* v. *Thurbee,* 13 Ill. 544.) The only exemption from taxation created by the act of 1880, in the case of the corporations for which the defendant acts as agent, is taxation upon capital stock and personal property. (Laws of 1881, chap. 542, § 8, p. 767.)

FINCH, J. This case submits for decision the constitutionality of the legislation which requires the agents of insurers, not incorporated under the law of the State, to pay annually, to the treasurer of the Exempt Firemen's Benevolent Fund of the city of New York, a percentage upon the gross premiums received by them for insurance upon property in that city. The constitutional provisions which are alleged to have been violated are article 3, section 18: that "the legislature shall not pass a private or local bill   *   *   *   granting to any private corporation, association or individual any exclusive privilege, immunity, or franchise whatever;" and article 8, section 10: that "neither the credit nor the money of the State shall be given, or loaned to, or in aid of, any association, corporation or private undertaking."

The legislation of the State, read in the light of facts historical in their character and within the common knowledge, enables us to trace the origin and growth of the volunteer fire department of New York. For more than a hundred years it was a recognized agency of the municipal government. The

engines, ladders and apparatus necessary for the extinguishment of fires were always the property of the city, and used under its direction and control. In the early rule of Stuyvesant, as director-general of the New Netherlands, a penalty of three guilders for every chimney found to be insufficiently swept was appropriated to the importation of buckets and hooks and ladders; and in 1731 two complete fire engines were bought by the city authorities in London. At first the apparatus appears to have been used by the citizens generally, but in 1737 the municipality petitioned the legislature "for the appointment of twenty-four able-bodied men, who shall be called firemen of this city, to work and play the fire engines, and who shall be exempt from serving as constables or doing militia duty during their continuance as firemen." Upon this request an act was passed reciting that "the inhabitants of the city of New York, of all degrees, have very justly acquired the reputation of being singularly and remarkably famous for their diligence and serviceableness in cases of fires;" and "have, at a very great charge and expense, supplied themselves and are provided with two fire engines and various sorts of poles, hooks, iron chains, ropes, ladders, and several other tools and instruments, for the extinguishment of fires;" and thereupon authorizing the common council to elect, nominate and appoint a sufficient number of strong, able, discreet, honest and sober men, willing to accept (not exceeding forty-two in number), " who were to manage and care for the fire apparatus," to be "called the firemen of the city of New York," and be ready for service "by night as well as by day." To "compel and oblige them" to be "diligent, industrious and vigilant," the common council were empowered to remove any of them and put others in their places, and, as an inducement to fill up the ranks, the firemen so appointed were "freed, exempted and privileged from the several offices of constable and surveyor of the highways, and of and from the being put into or serving upon any juries or inquest, and of and from being compellable to serve in the militia, or any of the independent companies of or in the said city, or any or either of them, except in cases of

invasion, or other imminent danger." Thus was formed the first fire company in the city of New York, and in its origin were developed the characteristics and established the relations important to be appreciated and considered. The duty of extinguishing fires was a public duty. It was due from all the citizens alike. The cost of the necessary apparatus was chargeable upon the public funds, and so in just proportion upon each individual. At first the labor necessary to its effective use was both due from all, and borne by all. The statute recites that citizens " of every degree " had done their part in the service. But it soon became apparent that the duty could be better discharged by a special and selected body of men. Skill would thus be acquired, good judgment secured, and confusion and the mistakes of excitement avoided. But a voluntary service, involving exposure and risk, was to be obtained. If that service was borne by the few they performed more than their own duty, and took upon themselves the share of labor and danger belonging to the many. The duty of the State and the right of the firemen was that equality of burden should be restored. The excess of duty borne by the few in one direction might fairly be compensated by an excess of duty borne by the many in other directions. Hence came the exemptions from certain other public duties, both as an inducement, and as a just and equitable distribution of common public burdens. So that these exemptions were in no sense gifts or alms, but were in their nature compensatory, the product of more than an equivalent rendered, and a readjustment by the State of the duties due from the citizens in general. Such an adjustment, reaching toward equality of burden, was an obligation of the State due to those bearing more than their share at the request and by the procurement of the State.

The precise relation of these firemen to the municipality and the State it is not easy to describe. They were not civil or public officers within the constitutional meaning (*People* v. *Pinckney*, 32 N. Y. 392), and yet must be regarded as the agents of the municipal corporation. Their duties were public duties; the service they rendered was a public service; their

appointment came from the common council and was evidenced by the certificate of the city officers; they were liable to removal by the authority which appointed them; and were intrusted with the care and management of the apparatus owned by the city. They were, at least, a public body, and, perhaps, are best described as a subordinate governmental agency.

With the growth of the city the number of the firemen increased, and the amount and danger of their service. The old engines, moved with difficulty and cumbrous and rude in construction, gave place to better machines, and the service improved as the demand upon it grew. The dangers of the work were obvious, and a courage and daring which has gone into history began to leave behind it men who were maimed and crippled in the public service, and widows and orphans deprived of their natural protectors and reduced to poverty and want. The firemen themselves were the first to see the growing difficulty and with characteristic unselfishness sought to provide a remedy. At a meeting of representatives of the different companies held in 1792 a constitution was agreed upon "for the purpose of establishing a fund for the relief of unfortunate firemen whose misfortune was occasioned while doing duty" as such. The fund was denominated the fire department fund, and to it were devoted "the moneys arising from chimney fires, certificates and donations." Experience very soon developed difficulties of collection and management growing out of imperfect organization and insufficient authority, and a request was presented to the legislature for an act of incorporation. In 1798 such an act was passed. It began with a recital that "the firemen of the city of New York have by their petition to the legislature prayed to be incorporated, the more effectually to enable them to provide adequate funds for the relief of disabled and indigent firemen, and for the purpose of extinguishing fires;" and then made the whole body of engineers and firemen a corporation by the name of "The Fire Department of the City of New York." It further provided that the funds of the corporate body should be appropria-

ted to the relief of indigent or disabled firemen, or their families, and that any surplus beyond that necessity should be applied to the purpose of extinguishing fires. The final section enacted " that this act is hereby declared to be a public act, and that the same shall be construed in all courts and places benignly and favorably for every beneficial purpose hereby intended." That the corporation thus created was a private and not a public corporation seems to have been held in *Wallack* v. *The Mayor* (3 Hun, 94), although the point was not directly in controversy. A corporation may be private although it performs a public duty, and even though its funds are provided by the State. (Ang. & Ames on Corp., §§ 33 and 34.) The incorporation of the fire department was not essential to its public duty of extinguishing fires. It could, as it did, perform that duty without becoming a body corporate. The change was needed only for the performance of its other duty, which partook in its nature of benevolence to individuals and the distribution of private benefits. But we need not determine the question at this point, if at all, since there occurred an entire change of the facts upon which conclusions should be founded.

In 1816 the firemen became dissatisfied with their exemptions, because limited to the period of their actual service, and the legislature, convinced of the justness of the demand, and feeling the duty and obligation of a further adjustment of the public burdens so as to approach equality more nearly, fixed a term of service for ten years, which was afterward reduced to seven, and then to five years, upon the completion of which, and an honorable discharge, the exemption continued for life. (Laws of 1816, chap. 104; Laws of 1829, chap. 100; Laws of 1847, chap. 369.) The law went upon the principle that an active and dangerous service for a term of years was not more than balanced by the exemption for life from lighter and less onerous duties; that further compensation for excess of public burdens faithfully borne was the just due of the firemen; and so set the example of a benefit continued because of the service after the service had been ended.

Sickels — Vol. XLVIII. 41

With these exemptions for many years the firemen rested contented, and continued to perform the public duty which constantly grew more difficult and important. Their benevolent fund appears, at first, to have answered its purpose, but probably before 1849 had become insufficient to meet the demands upon it, and imperiled by its weakness the strength and efficiency of the department, since in 1849 the State began to appreciate that it had a duty to perform beyond the exemptions already granted; that equality of burden was not yet secured; and that public policy on the one hand and a public obligation on the other required further action. The question was not one merely of sentiment or charity. Here was a body of men intrusted with important public duties, upon whose efficiency and faithfulness the public safety largely depended, but who were to be obtained without the aid of salary or pay, and must be drawn into the service not only by motives of duty or love of danger, but by judicious and even grateful treatment and recognition by the State. Out of this existing relation, and from a consideration of the public welfare, sprang the act of 1849, passed as a public act and dictated by a clear and definite public policy. Its general purpose was to aid and strengthen and stimulate the fire departments of the whole State; to acknowledge and recognize the value and need of the voluntary service rendered; and further equalize the burdens borne by the citizens. For some time a tax in the nature of a condition had been imposed by the State upon foreign insurance companies desiring to transact business within our jurisdiction. That tax was payable to the State, and a percentage upon the gross premiums received or contracted to be paid. The success and safety of these companies, together with our own, was largely dependent upon the skill and efficiency of the firemen, and this tax it was resolved to divert from the State treasury and make it payable to the fire departments of the State, in such manner as would best promote their efficiency, and tend to fill up their ranks with active, energetic and prudent men. It was, therefore, enacted that two per cent of the gross premiums received by agents of foreign companies in

any city or incorporated village should be paid to the treasurer of the fire department of such city or village ; if there was no such officer, then the treasurer of such city or village was to be deemed such officer and the payment made to him ; but in the city and county of New York the payment was to be made to the existing corporation representing the firemen of that city for its use and benefit.

This statute was clearly a public and not a private act, and general instead of local. It aimed to accomplish a public purpose; it was dictated by considerations of public policy ; it applied to every fire department in the whole State. It seems to us equally plain that the tax thus made payable was, in no just sense or respect, a gift of the public money, or a charity on the part of the State. It was an appropriation of the tax to a proper governmental and public purpose, and was received not on the ground of poverty or as alms, but as fairly and fully earned and justly paid. Indeed, no charitable motive influenced the action of the State or impelled its legislation. The appropriation was to the fire departments. What use they would make of it — to what purpose apply it — was left to them to determine where they had not already determined. Outside of the city of New York, and where the departments were for the most part unincorporated, the companies might appropriate the tax, as they often did, to the relief of their suffering brethren ; but if they did so the charity, if it was such, was theirs and not the State's. In the city the firemen had determined in advance the use first to be made of any such money, and fixed it by the act of incorporation granted precisely in the language of their request. So that, if there was a charity or a gift as between the departments and their beneficiaries, which itself may prove to be a debatable proposition, there certainly was neither as between the State and the departments. As between them the money was appropriated to a public use, and stood upon the identical ground of the exemptions. It was a new and further distribution of the public burdens, with a view of more nearly equalizing their pressure and dividing them more justly.

Very soon after the passage of this act its constitutionality was questioned. (*The Fire Department of the City of New York* v. *Noble*, 3 E. D. Smith, 440; *The Same* v. *Wright*, id. 453.) It was claimed to violate the provision of the Federal Constitution, that the citizens of each State shall be entitled to all the privileges and immunities of citizens of the United States, and the provisions of both the Federal and State Constitutions which forbid the taking of private property for public use without just compensation. Neither objection prevailed. The General Term of the Common Pleas held that the money was applied to a "public charity," "even if it cannot be said of it that such an appropriation is the applying of moneys to the public use." The court described the corporation plaintiff as "a charitable department of the city government," and found no difficulty in saying that the tax might be made payable directly to it without first passing through the treasury of the State. The judgment in these two cases was affirmed in this court, but as authority their application is very much modified by the changes which have occurred.

The act of 1849 was amended in 1857, and re-enacted with added requirements to make it more effectual, and from that time to the present its substantial provisions have remained unchanged. But important changes came in other directions. Steam invaded the fire department. The invasion was resisted by the volunteers, who saw in it the end of their service and the beginning of a new system, but the resistance was vain. The change impending led to a new corporation. The exempt firemen, those who had served out their terms and been discharged, had formed themselves into an association to aid the active firemen and for social purposes in the year 1842. In 1865 the volunteer fire department in the cities of New York and Brooklyn was replaced by a paid organization, styled the Metropolitan Fire Department. (Laws of 1865, chap. 249.) All the material and apparatus of the old organization was transferred to the new. The existing firemen were placed at once under the control of the new authority, and might be permanently enrolled and further employed, or be honorably

discharged from the service. Since steam took the place of men large numbers were discharged. But as this was without their fault, and they stood ready to serve their full terms, the State preserved to them their exemptions as if the full term had been reached, and so they swelled the number of the "exempts." To protect the benevolent fund endangered by the change, a new corporation was organized, which consisted of the president and two vice-presidents of the Association of Exempt Firemen, together with the old trustees of the superseded corporation, which was styled "The Trustees of the Exempt Firemen's Benevolent Fund," and to which the care and management of the fund and of the monument at Greenwood Cemetery was given. And to this corporation was further attached the right for five years to receive the percentage or tax in question. In 1870 that right was extended for seven years, and in 1877 for nine years more.

But meanwhile, and in 1875, the Constitution was amended by adding a new and important provision forbidding the gift or loan of the money of the State to any corporation, association or private undertaking; and it is now claimed that the acts of 1877 and 1879 were a gift of the money of the State to a corporation in violation of the fundamental law. Whether the tax of two per cent is or is not the money of the State has been much argued at the bar, but need not be decided, since granting it to be such, we are of opinion that its appropriation to the plaintiff corporation is not a gift within the meaning of the constitutional prohibition. We have already sought to explain why this was so during the existence of the volunteer department, placing it upon the same ground with the statutory exemptions, and holding it to have been compensatory in its nature and a redistribution of the public burdens with a view to equality and justice. The distinction is not new, but has had a very old application. It was the ground upon which the universities of Oxford and Cambridge were deemed civil and not eleemosynary corporations, the stipends given to magistrates and others being considered not charitable donations, but "*pro opera et labore*," preceded by service ren-

dered. (Blackst. Com., book 1, chap. 18, p. 471.) But in the present case the payment was continued after the service ended, and it is strenuously contended that, however the payment might be construed while the firemen were a public body and doing a public duty, the appropriation became purely a gift when made after the service ended, and when there was no legal or equitable obligation operating upon the State. It is true that no promise to continue the appropriation had been given, and the State was at liberty to withhold it; but that does not alter the inherent character of the payment when made. If a merchant fails in business and compromises with his creditors for a part only of their debts, or is discharged in bankruptcy with a small dividend, and thereafter being fortunate and becoming rich, calls his old creditors together, and gives to each principal and interest of the discharged balance, he does what he is not obliged to do, what neither law nor equity could compel, but he does not make a gift or dispense a charity. A purely moral obligation rests upon him, which he may or may not heed, but if he does, it characterizes his act, and makes that an honest payment of an honest debt which otherwise would have been a charity and a gift. So the State, in continuing the appropriation to the firemen when their services were no longer required, recognized an honorable obligation founded upon their past services and the injuries and suffering which those had occasioned. Just this policy had been adopted as to exemptions. They were continued after the service ended; and when the volunteers were disbanded without their fault and to make room for a paid service, justice and good faith required that the State should recognize its honorable obligation to keep up the fund as it had done for many years. The State did so, and we are concerned only with the question of the true character of its act. That which would have been merely a charity or a gift is not such by reason of the service given, the consideration rendered, the honorable obligation incurred. Its origin, its history, its characteristics require us to hold it not a charitable donation, but an appropriation of the public money, if indeed it be such, to a public use. The character of the obligation which leads to this result must not

be mistaken or under-estimated. Since the State cannot be sued without its consent, and acts without legal compulsion, it must be just. It must have honor and conscience. The motives which guide and control it must be those of absolute justice, and in almost every case its action, which is free and not compelled, must be governed by moral and honorable obligations, or solicitude for the public welfare.

When the State takes from the public treasury a sum of money and gives it to a corporate body for the relief of deserving beneficiaries it does one of two things. It either bestows a charity, or recognizes and discharges an obligation due from it to the recipients. The former it cannot do except in specified cases. The latter it may always do, for the constitutional provision was not intended and should not be construed to make impossible the performance of an honorable obligation founded upon a public service, invited by the State, adopted as its agency for doing its work, and induced by exemptions and rewards which good faith and justice require should last so long as the occasion demands. We do not apprehend that the wise prohibition of the Constitution is weakened or narrowed by this construction. While the State owes some general duty of charity to the poor and suffering, no body of men, corporate or associated, can, of their own accord, take upon themselves that duty without the request and procurement of the State, standing in no relation of authorized governmental agency, and yet put the State under an obligation which makes the bestowal of public money upon the corporate body something other than a gift or a donation. In the present case we have patiently traced the whole history of the appropriation and its recipients along the entire line of an abundant legislation, in order to feel sure that we have not mistaken the quality of the act, or erred in ascribing to the plaintiff corporation the character of a subordinate governmental agency employed by the State to fulfill its obligations due to the exempt firemen for the service they had rendered at the request and by the procurement of the State.

But another constitutional prohibition is invoked. It is argued that the act of 1879 was a private or local act, that the

corporation plaintiff is a private corporation, and the appropriation of the tax is a grant of an exclusive privilege, franchise or immunity. The argument that the act is local and the corporation private derives great force from the changes which have taken place, but we need not pause to test its accuracy, since the views we have already taken lead to the conclusion that the act of 1879 did not grant to the plaintiff corporation any exclusive privilege, franchise or immunity whatever. It is not claimed now that the appropriation of the tax was a grant of a franchise or immunity, but it is claimed that it was the grant of an "exclusive privilege." Whether the grant be deemed a bounty from the State, or, as we have held it, the discharge of an obligation, it cannot be described as an exclusive privilege within the constitutional meaning. If the State gives to a corporation an annual sum to be expended in a specific public charity, the gift is in no sense an exclusive privilege. The State may give it or not as it pleases. It may give the same amount to another, or to a hundred different corporations. It is a bounty in no sense or respect exclusive, and is scarcely to be described as a privilege at all. Still less does that phrase apply to a case where the appropriation is in discharge of an honorable obligation. When the State pays a just debt it does not confer on the creditor an exclusive privilege, or a privilege at all. Every other just creditor is alike entitled to his pay, and his receipt of it, or the State's payment in no manner affects or excludes the right of every other creditor to receive his pay in the same manner, or some other. The substance of the grant is simply a right to receive, for a specific period of time, a certain proportion of public funds, and if that right be deemed a privilege, it is in no just sense exclusive. That phrase was intended to describe grants in the nature of monopolies, of such inherent or statutory character as to make impossible the co-existence of the same right in another, and the language has no application to the case of an appropriation of public money or the proceeds of a tax to public uses or for a public purpose. The right of the plaintiff to collect and enjoy the proceeds of the tax would be in no respect disturbed or invaded if the State should give to another corpo-

ration in the same locality the right to collect a similar and further tax of two per cent from foreign insurance companies upon their premiums on business in the same city or town.

It is further said that the twentieth section of the third article of the Constitution is in point to defeat the act of 1879. The claim is that the act "imposes, continues or revives a tax," and does not "distinctly state the tax" nor "the object to which it is to be applied." But the tax in question, which is in the nature of a license fee or condition, is not at all within the constitutional provision. (*People* v. *Fire Association of Phil.*, 92 N. Y. 311.)

The act of 1879 is further assailed as one requiring, upon its final passage, the presence of three-fifths of each branch of the legislature to constitute a quorum, and the certificate of the presence of such quorum not being appended to the law as published, the presumption is that the necessary quorum was not present. (Const., art. 3, § 21; Laws of 1847, chap. 253; *People, ex rel. Purdy*, v. *Commissioners*, 54 N. Y. 276; 13 Am. Rep. 581.) So far as the constitutional provision relates to an act which imposes, revives or continues a tax, it is inapplicable, as we have just said; but it goes further and applies to a bill which makes or continues an appropriation of the public money. Since we have assumed, without deciding, that the tax in question was the money of the State, it becomes necessary to determine the effect of this prohibition upon that theory. The answer is that the appropriation for the last period of nine years was made by the act of 1877, as to which, no such defect of a certificate exists. That act continued the appropriation for nine years, but made it payable partly to the plaintiff corporation and partly to the new department. The only effect of the act of 1879 was to make the plaintiff the sole payee. It neither made nor continued an appropriation, but changed, in part, the payee of one already made and already continued for nine years. It was not, therefore, a three-fifths bill, and the absence of the certificate is immaterial.

It is finally urged that the defendant's corporation having paid the tax under the new system, as required by the act of 1880, is, by the terms of that act and of its amendment in 1881,

exempted from any other taxation. We have already decided this question adversely to the appellant, although so briefly as to have occasioned a renewal of the argument in the light of the additional facts developed in this case. It is certainly true that the exemption claimed is within the language of the statutes, for the tax in question is levied for "State purposes." But a case may be within the letter and yet not within the intention of the legislature. Under the act of 1880, we held, in *People, ex rel. The Westchester Fire Ins. Co.,* v. *Davenport* (91 N. Y. 574), that while the exemption claimed was within the language of the law, it was not within its meaning, and that the exemption conferred did not include local as distinguished from general taxation, and a tax levied and assessed for the benefit of a fire department in a particular locality was cited as an example of such local taxation. The doctrine was applied in *People* v. *Fire Ass'n of Phil.* (92 N. Y. 311) to a tax like the one before us, and the exemption held to relate to the general taxes levied for general State purposes. Taxation for "State purposes" may nevertheless in a given instance be local. The tax here assailed is upon the business done in a specific locality and for the benefit of the exempt firemen of the same locality. It is rather a condition or license fee than a tax, and constitutes the price of admission to our jurisdiction. While it is payable after such admission and after the certificate given, yet the payment is required to be secured by a bond given at the time of the admission and as a condition precedent to the issue of the certificate. That special requirement distinguishes it from ordinary taxation and stamps its character as a condition. It is, therefore, if a tax properly so-called, at least one of a special and peculiar nature, and imposed as part of the terms of admission to our jurisdiction. It was not repealed in terms and is not repealed by implication. No such purpose was within the scope and intention of the acts of 1880 and 1881. The appellant, therefore, was not entitled to the exemption claimed.

The judgment should be affirmed, with costs.

All concur, except Andrews, J., absent.

Judgment affirmed.