PEOPLE ex rel. STATE BOARD OF CHARITIES v. NEW YORK SOC. FOR
PREVENTION OF CRUELTY TO CHILDREN.

(Supreme Court, Appellate Division, First Department.    June 23, 1899.)

1. CHARITIES—SOCIETY FOR PREVENTION OF CRUELTY TO CHILDREN—VISITA-
TION AND INSPECTION.
The New York Society for Prevention of Cruelty to Children, which is
supported by public and private donations, and whose services are wholly
gratuitous, and not limited to any particular form of cruelty, is an
eleemosynary institution, so as to be subject, under Acts 1896, c. 546, §§
9, 10, to visitation and inspection by the state board of charities.

2. SAME.
The fact that the society is an auxiliary of the state and city and of their
officers, so far as in working out its objects it aids those officially required
to enforce the laws with regard to children, does not change its charitable
nature.

3. SAME.
It is immaterial that the society was incorporated under Acts 1875, c. 130,
relative to societies for the prevention of cruelty to children, instead of
under Acts 1848, c. 319, relative to charitable societies, or that Laws 1895,
c. 559 (Membership Corporation Act), classifies such corporations separately
from ordinary charitable institutions, since Acts 1896, c. 564, §§ 9, 10, ap-
ply to all charitable institutions, whether or not incorporated.

Appeal from special term, New York county.

Application by the people of the state of New York, on the rela-
tion of the State Board of Charities, against the New York Society
for the Prevention of Cruelty to Children, for a peremptory writ of
mandamus.   From an order granting a mandamus in part and
denying it in part (53 N. Y. Supp. 1017), both parties appeal.   Re-
versed in so far as the mandamus is refused.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY,
PATTERSON, and O'BRIEN, JJ.

John C. Davies, Atty. Gen., for relator.
De Lancey Nicoll, for defendant.

BARRETT, J.   The question here is whether the Society for the
Prevention of Cruelty to Children is a charitable or eleemosynary
institution, and as such subject to the relator's powers of visita-
tion and inspection.   It would almost seem as though the very ap-
pellation of the society suggested a solution of the question.   If
such a society is not a charitable institution, it is difficult to de-
fine its other character.   It certainly comes within every definition
of a charitable society to be found in the books, whether consid-
ered in the light of the statute of Elizabeth or independent of that
statute; and it also comes within the provisions of the constitu-
tion and statutes on that head as those provisions have been con-
strued by the court of appeals in People v. Fitch, 154 N. Y. 14, 47
N. E. 983.   It was there held that the word "charitable," as used
in the constitution and statutes conferring powers of visitation
and inspection upon the relator, should be given only its usual and
ordinary meaning.   It needs no more than that to bring the society
within the powers of the board.   The prevention of cruelty to
children is essentially a charity in the usual and ordinary meaning

of that word. Any other view of the mission of this society is quite inconceivable. It is not organized for gain. Its services are wholly gratuitous. It relies for support upon public and private donations. It does not limit its beneficent functions to any particular form of cruelty. Sins of omission are within its jurisdiction, as well as those of commission. The cruelly neglected child receives its ministering care or protection quite as much as the cruelly flogged child. It is, indeed, impossible to read the affidavit of Mr. Jenkins, the secretary and superintendent of this society, without finding in each of its specifications of the detailed work of the society an illustration of charity as defined in a long line of cases. He says that the society receives on commitment, upon and subject to the order of the court, all children charged with the commission of crime in the county of New York, who otherwise would be sent to the city prison; that it also receives temporarily, upon the order of a court, children who are the victims of physical violence in the county, or who are held as witnesses there pending the criminal prosecution of an offender; that it has authority to receive under commitment to itself, at its own expense, children under the age of 16,—an authority which, however, is but rarely exercised; that the children so committed are retained temporarily, and, as soon as circumstances permit, transferred to other institutions. While thus temporarily retained, they are properly cared for. Isolating rooms are provided for those who suffer from contagious disease, and a skilled nurse is always in attendance, who enforces every ordinance of the board of health and every suggestion of the society's physicians relative to the health of the children. The society also, so Mr. Jenkins deposes, receives and takes to court, without delay, children found in a state of destitution, for disposition by the court as prescribed by the statute. It maintains two officers in every police court, who, upon the order of the magistrate, investigate applications for the commitment of the children, and make written reports in regard thereto for the information of the magistrate. It receives the money which parents are required, under the orders of a magistrate, to appropriate from their weekly earnings to the support of committed children, and it pays these moneys over to the comptroller. If these moneys are not paid, it compels their payment by prosecution. It defends in the courts the custody of children committed to institutions through its instrumentality, prepares briefs for the district attorney's office in cases of cruelty where an indictment has been found, secures the attendance of witnesses, and assists the district attorney in the procuring and preservation of evidence. Now, what is this but charity pure and simple? Every specification of the work of this society is but a detail of the methods adopted to effect the objects which it seeks to attain, namely, the prevention of cruelty to children. It rescues them from vice, cleanses them morally and physically, mitigates their miseries, shields them from brutality or neglect, and alleviates the consequences thereof. It also helps to make such examples of the guilty as will prove a warning to others, and thus lessen the evils against which its moral and

material forces are arrayed. We quite agree with the society that the furnishing temporarily of shelter, food, clothing, and medical attendance are incidental to its main purpose. The test of its character is undoubtedly the objects which it seeks to attain as specified in the law of its being and—following that law—in its certificate of incorporation. Patrol v. Boyd, 120 Pa. St. 624, 15 Atl. 553. These objects, as we have seen, are inherently charitable. While the furnishing temporarily of shelter, food, clothing, and medical attendance are but incidents of the society's main purpose, so, too, for example, are the furnishing of lawyers to prepare briefs, and of agents to make arrests. These latter are not the fundamental objects to which the temporary furnishing of food are incidental. For they are themselves but incidents of the primary and essential purpose. That purpose is the prevention of cruelty to children, and the enforcement by all lawful means of the laws relating to or in any way affecting children. The laws relating to or affecting children are laws which have been passed for their protection and good. Aid gratuitously given by this institution in the efficient execution of these laws is just as much a charity as any direct aid given by it to unfortunate children. The enforcement of these laws is but a part and parcel of the general scheme of charitable beneficence comprehended within the expression "the prevention of cruelty to children." The laws upon the subject of children are of interest to the society only as a means to its special end. It is thus that it proposes to aid in their enforcement, not as a mere lover of abstract justice, or a defender of law in general.

The authorities both in England and this country are all one way upon this subject. Many of them are considered by Judge Martin in his elaborate opinion in People v. Fitch, 154 N. Y. 29–33, 47 N. E. 983. That learned judge cites with evident approval Judge Gray's admirable definition of the word "charity" in Jackson v. Phillips, 14 Allen, 539. That definition covers the relief of an indefinite number of persons from "disease, suffering, or constraint." Judge Gray's definition is but an amplification of Lord Camden's pithy expression, "A gift to a general public use, which extends to the poor as well as the rich." Jones v. Williams, 2 Amb. 652. It was said by Judge Swayne in delivering the opinion of the supreme court of the United States in Ould v. Hospital, 95 U. S. 311, that "a charitable use, where neither law nor public policy forbids, may be applied to almost anything that tends to promote the well-doing and well-being of social man." To give the use the character of a public charity, it is only necessary that there appear some benefit to be conferred upon, or duty to be performed towards, either the public at large or some part thereof, or an indefinite class of persons. Going v. Emery, 16 Pick. 119; Saltonstall v. Sanders, 11 Allen, 446. In University v. Yarrow, 1 De Gex & J. 72, it was held that a bequest "for the founding, establishing and upholding an institution for investigating, studying, and, without charge beyond immaterial expenses, endeavoring to cure, maladies, distempers, and injuries any quadrupeds or birds

useful to man may be subject to," was a good charitable bequest.
The lord chancellor (Cranworth), after stating that charitable be-
quests often failed for uncertainty, said:

"Where, however, the testator points out what he contemplates is highly
beneficial to the community at large, I do not know that any question has
then been raised as to whether it was within the statute of Elizabeth or not.
The statute of Elizabeth enumerates several objects which it says have been
those to which well-disposed persons have been in the habit of devoting prop-
erty, but the objects there enumerated are not to be taken as the only objects
of charity, but are given as instances. If that were not so, a cursory glance
has satisfied me that no general hospital would be within it, as the only charity
of this kind mentioned is the maintenance of sick and maimed soldiers and
mariners. * * * The courts have always construed the act as applying to
objects of the same nature as those specified, and I cannot entertain for a mo-
ment a doubt that the establishment of a hospital in which animals which are
useful to mankind should be properly treated and cured, and the nature of their
disease investigated, with a view to public advantage, is a charity."

In the case of In re Douglas, 35 Ch. Div. 472, there is a dictum
of Lord Lindley on the authority of the case last cited that the Home
for Lost Dogs was a charity, and an intimation that the Society for
the Protection of Animals from Vivisection, as described by the tes-
tatrix, was also charitable.

In Re Foveaux [1895] 2 Ch. 501, it was held that societies for the
abolition and suppression of vivisection are charities. Chitty, J.,
said:

"On principle, if a society for the prevention of cruelty to animals is a chari-
table society, it would seem to follow that the institution for the prevention
of a particular form of cruelty to animals is also charitable. The mere inflic-.
tion of pain is not necessarily cruelty; into the question what is cruelty the
moral element largely enters. It may be truly said that the infliction of justi-
fiable pain is not cruelty. The question of what is and what is not justifiable
is a question of morals, on which men's minds may reasonably differ, and do,
in fact, differ. Cruelty is degrading to man; and a society for the suppression
of cruelty to the lower animals, whether domestic or not, has for its object,
not merely the protection of the animals themselves, but the advancement of
morals and education among men. The purpose of these societies, whether
they are right or wrong in the opinions they hold, is charitable in the legal
sense of the term."

The same doctrine was maintained in Armstrong v. Reeves, 25 L. R.
Ir. 325, Vice Chancellor Chatterton there observing:

"I am of opinion that anything that tends to prevent the demoralization of
public opinion, which would be caused by an unauthorized and unnecessary
practice of dissection of living animals, would be for the public benefit, as
tending to correct and prevent cruelty or carelessness in reference to the suf-
fering of dumb beasts. I do not mean to express any opinion—I do not really
entertain any opinion—on the question of the total abolition of vivisection;
but, even if I differed in that respect from the objects of the society, which,
perhaps, I might do as an individual, that is not the question. The question
is whether the object in view is such as may fairly, within the principle of
decided cases, be deemed a charitable purpose. * * * If the members of
this society honestly believe—as I have no doubt they do—that vivisection is a
practice involving unnecessary cruelty to animals, I see nothing illegal in their
desire to procure its abolition by enactment. * * * I next come to the
bequest to the Carlsruhe Society. This society was formed for the protection
of animals, and, if this were all, it would prima facie be a charitable society.
The prevention of cruelty to animals has not only been a matter of legal de-
cision, but it is a subject of statute."

We need not refer to other authorities.   If societies for the prevention of cruelty to animals are charitable institutions, surely societies for the prevention of cruelty to children are equally so.   Indeed, the charitable character of this society has never been questioned until now.   On the contrary, that character has been asserted, proclaimed, and insisted upon by its officers and agents over and over again.   It is because of that character that it has received from the city of New York, by authority of law, and from private individuals, the means essential to its existence as a working institution; and it is because of the same character that it has been exempted from certain forms of taxation.   In the solicitation of donations it has earnestly pressed upon the public its charitable objects.   It is only when supervision is imminent that it protests against its being placed in the charitable category.   And what place does it now claim to occupy outside of that category?   It is really hard to say from anything suggested upon the argument or to be found in its brief.   If it is not a charitable institution, what is it?   There is no distinct answer to this question.   There is a trace of suggestion that it may be styled "a subordinate governmental agency,"—whatever, in the present connection, that may mean.   It is the first time we have ever heard it intimated that a private corporation, created under legislative authority, could be appointed and removed—in analogy to public officials—as an agent for the execution of the laws of the state.   When Judge Finch, in Trustees v. Roome, 93 N. Y. 313, applied that phrase to certain exempt firemen, he pointed out that their duties were public, that their appointment came from the common council, and that they were liable to be removed by the authority which appointed them.   The truth is that the powers to which the society points as suggestive of its "subordinate governmental agency" were conferred upon it independently for its direct corporate purposes, and not in any just sense as the agent of the state.   It could not well have been otherwise.   For, as Mr. Justice Landon clearly pointed out in Fox v. Society, 25 App. Div. 26, 48 N. Y. Supp. 625, while a private corporation may be employed to serve the government in various matters which are the subject of contract, it is certainly not eligible to public office.   "It is obvious," said that learned judge, "that the execution of police regulations which affect the life, liberty, property, health, and happiness of human beings should be vested in human beings, and not in such legal entities as cannot be endowed with moral qualities, and cannot be adequately punished for official misconduct."   A more accurate description of the society from its own standpoint would be that it is an auxiliary of the government, state and municipal, and of their officers, so far as in working out its objects it gives practical aid to those who are officially required to enforce the laws with regard to children.   But, as such auxiliary, it is still engaged in the execution of its charitable purposes.   No matter in what direction its efforts may lead, it is still pursuing its corporate road; still working without gain or hope of gain upon the capital of public and private donations, for the prevention of every form of cruelty to children; and for the enforcement of every law which aims at such prevention.   It is surely immaterial, then,

whether it was incorporated under the act of 1848 (chapter 319), with regard to benevolent, charitable, scientific, and insurance societies in general, or under the act of 1875 (chapter 130), with regard specially to societies for the prevention of cruelty to children. It was simply a novel form of charity, which called for powers not embraced within the act of 1848, and consequently demanded an independent, though still general, act. The same observations apply to the place given to these societies in the membership corporation act of 1895 (chapter 559). The question under consideration is entirely unaffected by such subsidiary considerations. The provisions of the Revised Constitution (article 8, §§ 11–15), and of the act of 1896 (chapter 546, §§ 9, 10), are not limited to charitable institutions incorporated under the act of 1848 and its amendments. They embrace all charitable or eleemosynary institutions, however incorporated, or however specially endowed with powers or privileges properly applicable to their essential characteristics. The language of the constitution and of the act of 1896 covers this society both in letter and in spirit. Clearly, it covers it in letter. The constitution says that the legislature shall provide for a state board of charities, which shall visit and inspect "all institutions, whether state, county, municipal, incorporated or not incorporated, which are of a charitable, eleemosynary, correctional, or reformatory character," with certain exceptions, having no bearing upon the present question. There is nothing in this language which limits the legislature with regard to the subjects of visitation and inspection. It may extend these subjects at its will. But it must make provision for the visitation and inspection of the constitutionally defined institutions. The act of 1896, supra, is even broader than the constitutional requirement, and evinces a legislative purpose to leave nothing to construction, but to bring all asylums, hospitals, and institutions other than institutions for the custody, care, and treatment of the insane, distinctly, and beyond the possibility of debate, within the area of the jurisdiction of the state board of charities. This section 10 reads in part as follows:

"All institutions of a charitable, eleemosynary, reformatory or correctional character or design, including reformatories (except those now under the supervision and subject to the inspection of the prison commission) but including all reformatories, except those in which adult males convicted of felony, shall be confined, asylums and institutions for idiots and epileptics, alms houses, orphan asylums and all asylums, hospitals and institutions, whether state, county, municipal, incorporated or not incorporated, private or otherwise, except institutions for the custody, care and treatment of the insane, are subject to the visitation, inspection and supervision of the state board of charities, its members, officers and inspectors."

And the previous section (9) gives the board jurisdiction over all institutions "which are made subject to its supervision by the constitution or by law."

So much for the letter of the law. Its spirit seems equally clear. Why, it may well be asked, should the people or the legislature have intended to withdraw these societies from the supervisory powers of the board? The very fact that they are clothed with unusual, peculiar, and even extraordinary powers, instead of being a ground for

exemption, seems rather to suggest a conclusive reason why they should be supervised, and, indeed, quite as vigilantly, as institutions possessing less power for good or evil. No reason has been assigned which would justify the exceptional withdrawal contended for. Surely, the state board of charities can be trusted with the sacred confidences of these societies quite as freely as the officers of the societies themselves. This society has no reason to fear an abuse of power on the part of such a board. It is simply a question, then, whether the convenience of these societies shall count for more than the public policy of the state with regard to the visitation and inspection of public and private institutions, as evidenced by the constitution and the law. There can be but one answer to such a question. In our judgment, the relator here was clearly within its jurisdiction in demanding the right of general visitation and inspection given to it by the constitution and by section 10 of the act of 1896, and the mandamus should have been granted in full, according to the tenor of its notice of motion.

The order appealed from should therefore be reversed, with costs, so far as it refuses the mandamus asked, and affirmed so far as it grants it; and the motion for the mandamus as asked by the relator should be granted, with $50 costs. All concur.