The People of the State of New York, Respondent,
   v. The Westchester County National Bank of
   Peekskill, New York, Appellant.

Constitutional law — gift of credit of state in aid of indi-
viduals — chapter 872 of Laws of 1920, providing for sale of
bonds of state and payment of proceeds as a bonus to indi-
viduals who served in World War, invalid as contravening sec-
tion 1 of article 7 of State Constitution.           ·

1. Whether or not the legislature is curbed by any constitutional
formula, no tax may be imposed except it be for a public purpose.
Otherwise, however, unless for some constitutional restriction the
taxing power is plenary. Except for such restriction the legislature
may appropriate public moneys for private corporations or for
individuals if thereby the public welfare is promoted.

2. Chapter 872 of the Laws of 1920, providing for the payment
of a bonus to residents of New York state who served in the mili-
tary or naval service of the United States at any time between
April 6, 1917, and November 11, 1918, for a longer period than two
months, promotes the public welfare and is not objectionable on
the theory that it appropriates public moneys for other than a public
purpose.

3. Whether the purpose is a public one is, however, no longer the
sole test as to the proper use of the state's credit. However important
or useful the objects designed by the legislature, they may not be
accomplished by a gift or a loan of credit to an individual or to a
corporation. (Const. N. Y. art. 7, § 1; art. 8, § 9.)

4. The provision of the statute in question that bonds of the state
shall be sold and the proceeds used for payment of such bonus con-
stitutes a gift of the state's credit to the same extent as if the bonds
themselves were to be given.          ,

5. The proposed bonus is not the payment of an equitable or moral
obligation due the beneficiaries from the state. That services rendered
the United States incidentally benefited every state is no foundation
for a claim of obligation. The act itself shows an attempt, not to
pay a claim, but to give a reward. The state proposes to give its
credit to the soldiers and sailors, not to satisfy any obligation that
it owes them, but as a gratuity. The act is, therefore, prohibited by
section 1 of article 7 of the Constitution, since such prohibition

30

may not be evaded by the assertion that an obligation exists, when in fact it does not exist. (*Bush* v. *Board of Supervisors*, 159 N. Y. 213, followed.)

*People* v. *Westchester County Nat. Bank*, 198 App. Div. 928, reversed.

(Argued June 29, 1921; decided August 31, 1921.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered June 20, 1921, in favor of plaintiff upon the submission of a controversy under section 1279 of the Code of Civil Procedure.

*Louis Marshall* and *Chester D. Pugsley* for appellant. If this legislation is violative of the Constitution in any of the particulars mentioned, then the bonds would be void and non-enforcible against the state. Consequently this infirmity would constitute a full justification for the defendant's refusal to accept and pay for the bonds which were struck off to 'it. (*Newburgh Savings Bank* v. *Town of Woodbury*, 64 App. Div. 305; 173 N. Y. 55; *Thompson* v. *Comrs. of Canal Fund*, 2 Abb. Pr. 248.) The purpose for which these bonds are sought to be issued was not a public but a private purpose, which does not fall within the taxing power of the state. If issued they would constitute the giving of the credit and money of the state in aid of individuals in violation of the organic law. (Const. N. Y. art. 7, § 4; *Kneedler* v. *Lane*, 45 Penn. St. 238; *Selective Draft Law Cases*, 245 U. S. 366; *Powers* v. *Shepard*, 48 N. Y. 540; *Weismer* v. *Vil. of Douglas*, 64 N. Y. 91; *Matter of Tuthill*, 163 N. Y. 133; *Bush* v. *Bd. of Suprs.*, 159 N. Y. 212; *Gautier* v. *Ditmar*, 204 N. Y. 26; *Stuart* v. *Palmer*, 74 N. Y. 188; *Olcott* v. *Board of Supervisors of Fond du Lac*, 16 Wall. 678; *People ex rel. D., W. & P. R. R. Co.* v. *Batchellor*, 53 N. Y. 142.)

*Charles D. Newton*, Attorney-General (*Edward G. Griffin, J. S. Y. Ivins* and *P. H. Clune* of counsel), for

respondent. *Charles G. Blakeslee, Charles P. Coffey, Samuel E. Aronowitz* and *Edward N. Scheiberling* for American Legion. The state has always had inherent power to grant a pension or gratuity to veterans of the wars. (*United States* v. *Hall,* 98 U. S. 343; *Frisbie* v. *United States,* 157 U. S. 160; *Taber* v. *Bd. of Suprs.,* 131 N. Y. 432; *Gilbert* v. *Minnesota,* 254 U. S. 325; *Gustafson* v. *Rhinow,* 144 Minn. 415; *Opinion of Justices,* 190 Mass. 611; *People ex rel. Doscher* v. *Sisson,* 180 App. Div. 464.) The amendments to the State Constitution do not limit this inherent power of the state as a sovereign to grant a bonus; such amendments apply at most only to the municipalities of the state. (*Rumsey* v. *N. Y. C. R. R. Co.,* 130 N. Y. 88; *Town of Guilford* v. *Supervisors,* 13 N. Y. 143; *Taber* v. *Suprs. of Erie County,* 131 N. Y. 433; *People* v. *Suprs. of Columbia County,* 43 N. Y. 130; *Powers* v. *Shepard,* 48 N. Y. 541; *L. V. R. R. Co.* v. *Canal Board,* 204 N. Y. 471.) The bonus will be expended for a public purpose founded upon good morals, equity and justice, and as such is valid under first principles and the existing Constitution. (*Matter of Mahon* v. *Bd. of Education,* 171 N. Y. 263; *People ex rel. Waddy* v. *Partridge,* 172 N. Y. 305; *Matter of Jensen,* 44 App. Div. 509; *Hammitt* v. *Gaynor,* 82 Misc. Rep. 196; *Porter* v. *Fletcher,* 153 App. Div. 470; *Matter of Borup,* 182 N. Y. 222; *L. V. R. R. Co.* v. *Canal Board,* 204 N. Y. 471; *People ex rel. Cayuga Nation of Indians* v. *Loan Commissioners,* 207 N. Y. 42; *Firemen's Benevolent Fund* v. *Roome,* 93 N. Y. 313; *Oswego, etc., R. R. Co.* v. *State,* 226 N. Y. 351; *State* v. *Clausen,* 194 Pac. Rep. 793.)

ANDREWS, J. The only question before us is the validity of chapter 872 of the Laws of 1920. The defendant was the successful bidder for $25,000 of bonds issued under the authority of that act. It later refused to accept them. If the act is constitutional, under the

submission the plaintiff is entitled to an affirmance of the judgment of the Appellate Division in its favor. If not, the defendant should succeed.

The act provides for the issue of $45,000,000 of bonds by the state. Their proceeds are to be paid into the state treasury and expended for a bonus to persons who served in the military or naval service of the United States at any time between April 6th, 1917, and November 11th, 1918. These moneys, therefore, must be applied for this object and for no other purpose whatever. (Constitution, art. 7, sec. 4.) " Every person, male or female, who was enlisted, inducted, warranted or commissioned, and who served honorably in active duty in the military or naval service of the United States at any time " during the war " for a period longer than two months, and who at the time of entering into such service was a resident of the state of New York, and is a resident at the time this act takes effect, and who was honorably separated or discharged from such service, or who is still in active service, or has been retired, or has been furloughed to a reserve," is to receive ten dollars for each month of active service, not exceeding, however, $250 in the aggregate. If dead the same amount shall be paid to the relatives of the deceased. As required by its terms this act was submitted to the people and was approved by a vote of 1,454,940 in its favor as against 673,292 in opposition.

The logic of this opinion is not that the legislature is unauthorized to aid the wounded. We cannot too clearly emphasize at the outset of our discussion that this is not an act to care for and restore to health and usefulness those who became disabled in the performance of their duty. To do this is a sacred trust. Every human impulse prompts us to its full accomplishment. Neglect here spells disgrace. Yet by this act help for the wounded is at least postponed. For them as a class nothing is done. Whatever right the state may have to use its

moneys in making these the subject of its first and devoted
consideration, this right finds no expression in the present
statute. The wounded are not a reason or a ground for
its enactment. He who occupied a perfectly safe,
although highly useful desk in a department, stands
on a level, under this act's provisions, with that other
who comes back to us shattered in mind or body because
of a more perilous service. This court, of course, con-
siders the purpose of the act as it is written. What we
may say has no bearing upon and is no definition of the
power of the state to provide for the disabled, for whose
prompt and adequate care there is an insistent and
righteous demand.. The statute includes every one
indiscriminately, who served the United States for two
months, whatever the circumstances of his or her induc-
tion into the service. It is not in fulfillment of any
promise made to encourage enlistment. The Selective
Service Act expressly provided that no bonus should be
given for that purpose and that no substitute should
be accepted. It called upon every citizen of the United
States between certain ages to render his full obligation to
the nation. The only exceptions allowed were those made
in the act itself. It is also true that the number of the bene-
ficiaries and the amount they will receive is indefinite.
It is now assumed that $45,000,000 will suffice. It may
be so. It may be equally true that a far larger sum will
be required to make the payments designed. We all
know how often, when an issue of bonds is proposed,
the amount that will be required in the end is under-
estimated. More than once we have had that experience.
Nor is there any assurance that other and greater debts
may not be incurred if a second bonus is proposed. It
may be said, and said truly, that ten dollars a month will
not compensate our soldiers for their sacrifices. Else-
where the sum of fifteen dollars or more has been allowed
under somewhat similar acts. Should New York, it has
already been asked, do less than others? We see no

limit to the indebtedness with which the state may be burdened.

If, however, the legislature has the power to create a debt for the purpose declared in this act, these considerations are not for us. They serve but to admonish us to scrutinize our Constitution with the greater care, to use the greater caution in deciding how and when and why New York may incur indebtedness under its limitations. To that question we confine ourselves.

At the basis of our ideas as to the relation of the citizen to the state is one outstanding principle of taxation. Whether or not the legislature is curbed by any constitutional formula no tax may be imposed except it be for a public purpose. Otherwise, however, unless for some constitutional restriction the taxing power is plenary. Except for such restriction the legislature may appropriate public moneys for private corporations or for individuals if thereby the public welfare is promoted. (*Town of Guilford* v. *Board of Supervisors, Chenango Co.,* 13 N. Y. 143.)

It is said that this act serves no such purpose. We think, however, that it does. In deciding whether the object for which taxation is imposed is for a public object the courts "must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to a public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation." (*Loan Association* v. *Topeka,* 20 Wall. 655, 665.) In this state the granting of pensions and gratuities for military service is not a new experiment. By the act of May 11th, 1784, public land was granted

to revolutionary veterans. By chapter 8 of the Laws of 1814, pay in addition to that granted by the United States was given to soldiers of the war of 1812. By chapter 178 of the Laws of 1904 a pension was granted to the last survivor of that war. By section 220 of the Military Law a pension was given to any member of the militia who had been disabled within ten years in the performance of duty. A pension policy has long been adopted by the United States and acts similar to ours have been passed in at least nineteen other states.

The payment of a pension or a bonus for past services showing the gratitude of the people, showing that the state is mindful of those who have made sacrifices for it, is an incitement to patriotism and an encouragement to defend the country in future conflicts. Even if such a payment is not clearly one made in the general interest, at least there is such ground for the claim that where the legislature has accepted that view, the courts may not interfere. That they believe the action unwise or unnecessary is immaterial. As to that question the legislature is the final arbiter. (*Jones* v. *City of Portland*, 245 U. S. 217; *State ex rel. Atwood* v. *Johnson*, 175 N. W. Rep. 589; *State ex rel. Atwood* v. *Johnson*, 176 N. W. Rep. 224; *Gustafson* v. *Rhinow*, 144 Minn. 415; *State ex rel. Hart* v. *Clausen*, 194 Pac. Rep. 793; *Opinions of the Justices*, 211 Mass. 608.) What long custom and usage has sanctioned, what the weight of judicial authority has approved, that we should be slow to declare wrongful. Nor may a distinction be made between such a bonus as our act provides and a pension. The one is a reward for past military services payable at once; the other such a reward payable in installments.

We are to determine, therefore, whether there are any limitations in our Constitution upon the powers of the legislature which affect the matter before us. Originally there were none. In the constitutional convention of 1846, however, it was found that the state had contracted

debts which with interest amounted to some $38,000,000. Six million dollars represented instances where the public credit had been used to finance railroads then insolvent; $2,700,000, for railroads still rated as solvent but whose condition was precarious. There was much discussion as to how this debt should be paid, and as to how in the future "abuses of delegated power" should be prevented. Gross extravagance was charged. There was fear of repudiation. Moneys raised by loans could be wasted with little comment, when the same waste would cause a storm of protest if the moneys had to be raised by taxation. The existing evil required drastic remedies. The power to create debts must be curbed before ruin came. Reliance might not be solely placed upon the public spirit and the economic knowledge of the legislature. Something more was needed. So the committee on the state finances finally reported an article entitled "On the power to create future state debts and liabilities and in restraint thereof." This report, which was adopted with immaterial verbal alterations, became a part of article 7 of the Constitution. No longer under any circumstances might the credit of the state in any manner be given or loaned to or in aid of any individual, association or corporation. To meet casual deficits the state might contract debts not exceeding at any time $1,000,000 in the aggregate. It might also contract debts to repel invasion, suppress insurrection or for defense in war. Except for these purposes a debt might be incurred at all only for some specific object distinctly named, in an act passed in a certain way, approved by the people, containing provisions for a direct tax sufficient to provide for its repayment within eighteen years.

This article as reported was confined solely to limiting the power of the legislature as to debts. It did not touch the power to appropriate the property of the state or the money it might raise by taxation for payments or gifts to individuals or corporations so long as such pay-

ments or gifts subserved the public good. It was proposed to limit this power also. Mr. Charles O'Connor suggested the addition to the section of the provision " Nor shall any gift of public moneys or property be made, except as a reward for military services, or by the release of escheats and forfeitures." This was objected to, however, and as the evil apparently was not serious, the effort was abandoned and the section was allowed to stand as reported. (Debates of the Convention, p. 722.) In the address by the members of the convention to the people it was said: " They have incorporated many useful provisions more effectually to secure the people in their rights of person and property against the abuses of delegated power." (Convention Journal, p. 1547.)

Cut off from the right to loan or give the credit of the state, however, by 1867 the legislature had begun to resort freely to grants of public funds to railroads and to charitable associations. Therefore, in the constitutional convention of that year the attempt was renewed to deprive it of that power. Sanford E. Church, later the distinguished chief judge of this court, reported from the committee of finance a proposed article of the Constitution. It contained a section numbered eleven. " Neither the credit, money or property of the state shall in any manner be given or loaned to or in aid of any individual, association or corporation." (Proceedings of Debates, p. 791.) This proposal was debated at length but it was not adopted.

This Constitution having been rejected by the people a commission was appointed in 1872 to consider amendments. It was again proposed to limit the right of the state with regard to gifts and loans of its property. The committee on sectarian appropriations reported a clause: " Neither the credit nor the money or property of the state or of any county, city, village or town shall in any manner be given or loaned to or in aid of any association, corporation or other private institution whatever."

Later a substitute for this proposal was accepted — " neither the credit nor the money of the state shall be given or loaned to or in aid of any association, corporation or other private undertaking." Still later the word " other " was deleted. In the report it was said that this proposed amendment " cuts off all gifts of money and all loaning of the credit of the state to all other associations, corporations, etc., but they are all subject to the same objection and appropriations to them of the money of the state are liable to the same abuses. They must all stand or fall together." (Journal, p. 452.) In this form the section now stands in our Constitution. (Art. 8, sec. 9.)

We find, therefore, among others, two limitations imposed on the legislature in addition to the one that was always implied. They both relate to gifts or loans either of the credit or the moneys of the state. " The credit of the state shall not in any manner be given or loaned to or in aid of any individual." (Art. 7, sec. 1.) " Neither the credit nor the money of the state shall be given or loaned to or in aid of * * * any private undertaking." (Art. 8, sec. 9.) They both also represent the triumph of efforts to prevent improvidence, to make useless any pressure from special interests, to safeguard the credit of the state, and the interests of the people as a whole. They are not to be brushed aside. They are to be fairly construed to obtain the object for which they were intended. As in 1846 so to-day economy, public and private, is one of our pressing needs. Upon it depends the prosperity of the state and its inhabitants. The crushing load of taxation — national, state and municipal — now as then threatens our future — the future of him who pays no direct taxes as well as the future of him who does. Now as then great expenditures may be lightly authorized if payment is postponed. To place the burden upon our children is easy. Nor do we scrutinize so closely the expenditures to be made if that be

done. We all recognize this tendency in private life. We incur a future obligation cheerfully, where we would hesitate had we to pay the cash. It is true in public matters. The pressure which will come when the obligation matures is ignored. Conscious of this human weakness, to guard against public bankruptcy the people thought it wise to limit the legislative power. The courts must see to it that their intentions are not frustrated or evaded. And this is true even if the action questioned seems to be approved by the voters. One of the chief objects of the Constitution is the protection of minorities against the hasty acts of the majority. It expresses the well-considered, unimpassioned and deliberate judgment of the people. It is not to be amended informally. Twice, two legislatures, with newly elected members in each house, must pass upon such a proposal before it is submitted to the voters.

Whether the purpose is a public one, therefore, is no longer the sole test as to the proper use of the state's credit. Such a purpose may not be served in one particular way. However important, however useful the objects designed by the legislature, they may not be accomplished by a gift or a loan of credit to an individual or to a corporation. It will not do to say that the character of the act is to be judged by its main object — that because the purpose is public, the means adopted cannot be called a gift or a loan. To do so would be to make meaningless the provision adopted by the convention of 1846. Gifts of credit to railroads served an important public purpose. That purpose was distinctly before the legislatures that made them. Yet they were still gifts and so were prohibited.

As we have seen, this act provides that $45,000,000 shall be raised by the state upon its bonds and the proceeds applied as a bonus to those who have been in the military service of the United States. We have seen also that the proceeds can be used only for this one object. Is this a

gift or a loan of the credit of the state? Clearly it is not a loan. A loan implies repayment. Here there is no such situation. The bonds are issued for full value. Their proceeds are transferred absolutely with no promise, express or implied, of return.

If not a loan then does this act contemplate a gift of the state's credit? In answering this question the mere form of the transaction is immaterial. If the gift of the bonds of the state to a railroad corporation would be such a gift — and it undoubtedly would be — then so would be an issue of bonds by the state with the express condition that their proceeds should be given to the same corporation. The evasion of the constitutional prohibition would be palpable and it could not and should not be permitted.

The important question is, therefore, whether under this act the provisions made for the soldiers and sailors is a gift to them or a gift in their aid. We have held that a payment to an individual is not a gift if it be made in recognition of a claim, moral or equitable, which he may have against the state. " The legislature, however, is not prevented from recognizing claims founded on equity and justice though they are not such as could have been enforced in a court of law if the state had not been immune from suit." (*Munro* v. *State of N. Y.*, 223 N. Y. 208, 215.) What meaning then have the courts given to these terms? What is an equitable or moral obligation against the state? Instances where such payments have been authorized are many. In some, claims have been allowed where beneficial services have been performed for the state (*Cole* v. *State of N. Y.*, 102 N. Y. 48); in others where property was furnished it (*O'Hara* v. *State of N. Y.*, 112 N. Y. 146); or the state received money for land the title to which proved defective (*Wheeler* v. *State of N. Y.*, 190 N. Y. 406); or work was done, the expense of which in equity the state should bear (*Lehigh Valley R. R. Co.* v. *Canal Board*, 204 N. Y. 471). In

another class of cases the legislature has authorized payment where the claimant had been injured by the negligence of the servants of the state. (*Splittorf* v. *State of N. Y.*, 108 N. Y. 205.)

These cases give some indication of what we mean when we speak of a moral obligation. In all some direct benefit was received by the state as a state or some direct injury suffered by the claimant under circumstances where in fairness the state might be asked to respond — where something more than a mere gratuity was involved.

We are referred, however, to three cases where it is said a far wider interpretation was given to this doctrine. This we believe to be a mistake. In *Munro* v. *State of N. Y.* (223 N. Y. 208) Munro was employed by the state in what has been defined as a hazardous employment in connection with a state hospital for the insane. (Workmen's Compensation Law [Cons. Laws, ch. 67], sec. 2, group 7.) While engaged in his work he was struck by one of a gang of eighteen insane patients, who, under the care of two keepers, were repairing a road. The state conceded on the trial that Sabilski, who assaulted him, was known to be dangerous, and also conceded that there was negligence in permitting him to be working in a gang with but two attendants. Under these circumstances there was a clear moral obligation. Munro was injured by the negligence of the state's employees. He was engaged in the kind of work which had the employer been an individual would have, our legislature has said, required compensation for an accident irrespective of fault. In *Matter of Borup* (182 N. Y. 222) we held that by retroactive statute the legislature might assume liability or require a town to assume it where the owner's property was injured by a change of the grade of a street although at the time of the change no recovery was possible. The law in this respect was, to the common idea, unjust. For the benefit of the public a private injury must be borne

without compensation. We carefully pointed out that the individual was harmed by a public work authorized by the state. Under such circumstances it might fairly be said that a moral claim existed to compensation for affirmative acts done under its authority. In *Trustees Exempt Firemen's Benev. Fund* v. *Roome* (93 N. Y. 313), volunteer firemen in New York city served without pay and to partly compensate them for years they were exempted from certain public duties and also a tax upon foreign insurance companies was paid to a corporation representing them for their use and benefit. The corporation in turn used these funds to aid them when they became disabled and indigent. When the paid fire department came into being and the volunteer firemen were disbanded the exemptions were continued and so for a limited time were the provisions as to this tax. Under the circumstances we said that this was not a gift. It was the performance of its equitable obligation by the state. The firemen had enlisted with this provision in view; they were disbanded without fault of their own; in justice the state should maintain this fund in the future as it had in the past until its objects were accomplished. Again, however, this obligation arose because of the acts of the state. The state but fulfilled, and in honor it should, its implied promise under which it had obtained the unpaid service of the firemen.

In every case that we have found, therefore, there was the foundation of a claim against the state itself, however imperfect. In all there was some obligation, not enforcible against it, perhaps because it might not be sued, perhaps because the maxim of *respondeat superior* may not be invoked against it, perhaps because of the absence of some small element, the presence of which would give a legal cause of action and where without that element payment might still be morally required. They are cases where the state is allowed to make compensation for benefits which it has received or for injuries which

have been suffered in its service or because of its acts or acts done under its authority or because of the acts of its servants. So far at least when we have used the term we have implied an obligation — something that binds — if not in law, at least in morals. There must be a duty, even if it is a duty not enforcible. The desire to compensate those to whom we owe gratitude is a natural one. It finds expression every day in common life. It is entirely to be praised. But a moral obligation, when we use that term in relation to the spending of public funds, means more than this. Gratitude is not enough.

Under these decisions is the bonus to our soldiers and sailors the payment of an obligation due them from the state? This is the ultimate question. Upon its answer depends the validity of the act of 1920. It is so conceded in one of the dissenting opinions. And in discussing it we do not ignore the splendid services and the great patriotism not only of the American expeditionary forces but of those who remained on this side of the sea. We do not forget the love and admiration that they have won and the gratitude that is theirs. We know that when the United States declared war it declared it for the whole country; that the government of the state, the government of the United States were equally interested in victory; that while serving the United States our soldiers and sailors were also protecting New York. We were all vitally interested in the war. Defeat spelled unspeakable calamity. Yet the men who gained the victory were not in any respect servants of the state. It did not call them from their homes or lead them to battle. It did nothing. It exercised no authority. It is said that our soldiers were taken from homes and occupations and compelled to risk their lives for inadequate pay while others earned large wages in safety — that the statute attempts in a small way to distribute more fairly the public burden. It is all true, but again the state was not

the actor.   Neither it nor its servants injured any one. It received no property for which it has not paid.   Nor were services rendered to it in any sense that services were not rendered to every city in the land.   That services rendered the United States incidentally benefited every state is no foundation for a claim of obligation, however great the gratitude due.   Gratitude may impel an individual to reward his benefactor.   One may do as he will with his own.   The state of New York may not. Its Constitution forbids.   It may not attempt to equalize among its citizens inequalities caused by federal legislation.   For that equalization resort must be had to the federal government.   And the federal government recognizes the claim.   It intends to discharge the obligation as its own.   As soon as its finances permit payments are to be made that it is estimated will amount to between $3,000,000,000 and $5,000,000,000.   This proposition receives popular approval.   It is not forbidden by our national Constitution.   Thus and thus only can every one, in whatever state he may reside, receive an equal reward for equal services.   And when the time comes for this distribution New York, as a part of the United States, will bear a very large proportion of the total expense involved.   So it will aid in repaying the moral obligation which is due from the country to its defenders.   But under this act it will bear a double burden.   Its citizens will pay twice — once for the state, once for the nation. Is New York under a moral obligation to make this second satisfaction?

Should we give the words "moral obligation" the broad meaning urged upon us we may go far.   More than once men of whom we are proud, through sheer patriotism, have gone to Washington and served us in serving the United States at great cost to themselves in money and health and comfort.   Have they a moral claim against the state?   It is said they were voluntary agents, that they were not compelled to do what they did.

Is the obligation less towards one who aids us of his free will than towards one whom the law constrains?

On its face the act itself shows an attempt, not to pay a claim but to give a reward. No distinction is made between one and another. All, whatever their merits, whether their duties led them to danger or to safety, are treated alike. No attempt is made to adjust economic conditions. And as a reward not a payment the public rightly regards it. Did the majority favor the act because they believed they were discharging an obligation? Or was their vote a testimony of their gratitude? We are told that similar statutes have been passed elsewhere. So we have already said. It is one thing, however, to quote such practices as illustrating those fundamental principles common to free governments as we have quoted them. It is another to use them as defining the distinction between a gift and the payment of an obligation necessitated by the language of our Constitution. Such decisions as have been made show the danger of such a course. In Massachusetts the justices were of the opinion that money might lawfully be raised by taxation to pay veterans of the Civil War but they speak of such a payment as a gratuity. (*Opinion of the Justices,* 211 Mass. 608.) In Wisconsin money was to be raised by taxation to pay a bonus to veterans. In considering the constitutionality of this act the court held that notwithstanding the soldiers served the United States they also served Wisconsin and that as the object was to promote loyalty the act served a public purpose. But the question we must decide, whether any moral obligation rested on the state to make compensation, did not arise. The inference is that the court did not so believe for it treats the bonus as a mere gratuity. Further, an article in its Constitution similar to ours (Wisconsin Constitution, sec. 3, art. 8), was not violated, not because the bonus was in payment of an obligation but because

31

the money was to be raised by taxation. (*State ex rel. Atwood* v. *Johnson*, 175 N. W. Rep. 589; *State ex rel. Atwood* v. *Johnson*, 176 N. W. Rep. 224.) In Minnesota the money necessary to pay a bonus was to be borrowed. It was held that the purpose of the loan was public and the act•constitutional. A clause like ours was in the Constitution (Sec. 10, art. 9), but this phase of the matter seems not to have been argued. Certainly it was not referred to in the opinion. (*Gustafson* v. *Rhinow*, 175 N. W. Rep. 903.) Again in Washington a bonus was to be financed by an issue of bonds. Again, too, a similar clause in the Constitution (Sec. 5, art. 8) was not referred to. But in discussing whether the purpose of the act was public, the court did say that moral obligation to make a compensation rested on the state. (*State ex rel. Hart* v. *Clausen*, 194 Pac. Rep. 793.)

As striking an illustration as can be found of the general understanding of this subject may be found in a recent message of the President of the United States to Congress. He says: " I have commended the policy of generous treatment of the nation's defenders, not as a part of any contract, not as a payment of a debt that is owing, but as a mark of the nation's gratitude."

We need, however, go no further than our own decisions. We have used the same language under like circumstances. In 1892 an act was passed directing supervisors to raise by tax and pay each man drafted in the Civil War the sum of $300. Such men never received a bounty. They were compelled to serve, as the majority of the soldiers and sailors of this war served, under an act of the national government granting them no compensation except their military pay. We said our national government had the right to call upon these men and that they had no claim, legal or equitable, against the town or county where the money was to be raised. Those who served under conscription only discharged their obligation to the general government. They did nothing more than fulfill their

duties as citizens, and we called the proposed grant a gratuity. It is true the case might have been decided upon another ground alone. As a fact it was not. Therefore, what this court said cannot be treated as dictum. And if because of the circumstances there was no equitable claim against a county it would seem there was none against the state. The same reason would be applicable. (*Bush* v. *Board of Supervisors, Orange Co.,* 159 N. Y. 213.)

We are not forgetful of the fact that if there is any reasonable ground for the legislative decision that a moral obligation exists, the courts may not intervene. If there is such a ground the legislature must determine whether the claim shall be recognized. But the prohibitions of the Constitution may not be evaded by the assertion that such an obligation exists, when in fact it does not. Arbitary action may not convert a wrong into a right.

Such we believe. is the situation here. The state proposes to give its credit to the soldiers and sailors, not to satisfy any obligation that it owes them, but as a gratuity. The act is, therefore, prohibited by section 1 of article 7 of the Constitution.

The judgment appealed from should be reversed and judgment should be rendered in favor of the defendant against the plaintiff, with costs in this court.

CARDOZO, J. (dissenting). " The credit of the state shall not in any manner be given or loaned to or in aid of any individual, association or corporation " (Constitution of New York, art. VII, sec. 1). The purpose of the prohibition is revealed in its history (2 Lincoln, Constitutional History of New York, p. 87). The purpose was to put an end to the use of the credit of the state in fostering the growth of private enterprise and business. That is the mischief which gives understanding of the ermedy. I do not mean that the prohibition is to be limited to the particular evil that inspired it. It *is*

limited, however, to evils of a kindred nature. The
credit of the state may not be pledged in aid of an indi-
vidual who has no claim in justice or morals to relief or
compensation. It *may* be pledged in recognition of
an honorable obligation to effect a proportionate and
equitable distribution of the burdens of public service
(*Munro* v. *State of N. Y.*, 223 N. Y. 208, 216; *Matter of
Borup*, 182 N. Y. 222; *Trustees of Exempt Firemen's Benev.
Fund* v. *Roome*, 93 N. Y. 313, 326). Payments so made or
promised are in one sense gifts, for they are the voluntary
assumption of liabilities not theretofore imposed by law.
They are not gifts, however, in the sense of the pro-
hibition under discussion, for their animating purpose is
not benefaction, but requital.

   We are told that requital, if due at all, is due, not from
the state, but from the nation, which summoned the host
to service. I find myself unable to define by bounds so
artificial the claims of equity and honor. The service
that preserved the life and safety of the nation preserved
at the same time the life and safety of the states (*Opinion
of the Justices*, 190 Mass. 611, 615; *Gilbert* v. *Minnesota*,
254 U. S. 325, 328; *Gustafson* v. *Rhinow*, 144 Minn. 415;
175 N. W. Rep. 903; *State ex rel. Atwood* v. *Johnson*, 170
Wis. 251; 175 N. W. Rep. 589). If something is still due
beyond the letter of the bond (*Opinion of the Justices*, 175
Mass. 599), state, as well as nation, will not rest till justice
has been done. Neither can silence conscience by referring
the claimant to the other. I am not convinced by the
argument that reparation, if due from our legislature to
residents of New York, is due in equal measure to residents
of Maine and California. Each state may fairly be left
to take care of its own. Most have already done so.
One finds it hard to believe that they have, all of them,
been meddling in matters not of their concern. It is the
state rather than the nation — possessing as the state does
the residuary powers of government — which in our
federal system is to be viewed as *parens patriæ*. The

parent does not listen unmoved to the necessities of her sons who have fought in her defense.

I pass, then, to the question whether the legislature might reasonably hold that men who in greatly serving had also greatly suffered, gained thereby a claim to reparation for their suffering. I mean, of course, a claim in justice or equity or morals or honor. Great achievement and great sacrifice have been meagrely rewarded. The perils of battle, the hardships of camp and trench, may be poorly paid at any price; few will assert that they are recompensed at the rate of a dollar a day. Even for those who did not reach the firing line, there were the pangs of separation from home and kindred, the anxieties and the strain of a new and hazardous adventure. Legislature and people, beneficiaries of this devotion, have heard the call of a moral duty to mitigate the disparity between suffering and requital. But the catalogue of suffering does not end with pain of mind and body. There was money loss as well, or so at least a legislature, looking at average conditions, might not unreasonably believe. Its judgment in such matters must prevail unless wholly arbitrary and baseless (*Matter of Stubbe* v. *Adamson*, 220 N. Y. 459, 469). Labor in the market was paid with no such modest stipend as these men received for labor in submarine and trench. Even with food and housing added to the stipend, we cannot say that there is mere caprice in a finding of the lawmakers that compensation was inadequate. Often the stipend was sent home for the benefit of relatives who, if not wholly dependent on the absent one, had need of something more if they were to be maintained in his absence according to the standards of the past. Lost also were indefinite opportunities for profit and advancement. While soldiers and sailors risked their lives abroad, wages abnormally high were the reward of those who stayed behind. The losses did not end with peace. Men who had left their callings

overnight, breaking up the old relations of business and employment, found on their return that business must be rebuilt, and employment sought anew.   Then, too, the shock and strain provoked a period of reaction, in which idleness was inevitable.   New losses must be suffered till work could be resumed, and life adjusted to the ways of peace.   It is significant, I think, that the statute limits the bonus to soldiers and sailors of the lower grades, *i. e.*, to those whose pay was smallest, and who are most in need of aid.   Of these, some may bear a loss more easily than others, but for many, if not for all, there will be loss in some degree.   Legislation, in such matters, must take note of average conditions (*Tenement House Dept. N. Y. City* v. *McDevitt*, 215 N. Y. 160, 167).   The problem is too complex, the difficulty of proof too great, for investigation of the individual case, and adjustment of reward accordingly.   We take judicial notice of these things (*People ex rel. Durham Realty Co.* v. *La Fetra*, 230 N. Y. 429; *People* v. *Schweinler Press*, 214 N. Y. 395; *Matter of Stubbe* v. *Adamson*, 220 N. Y. 459).   We take judicial notice, too, that since the beginnings of our history, a sense of the moral obligation to give aid to 'the returning soldier has been felt and acted on by government (*U. S.* v. *Hall*, 98 U. S. 343, 346).   The call of these and kindred equities has been heard and answered in the past.   Are the equities so feeble, is their summons so plainly an illusion, that we may answer them no more?

We have held that the legislature is still free, with all the restrictions imposed by the Constitution upon gifts of money or of credit, to assume liability in law when liability may be found in equity or honor (*Lehigh Valley R. R. Co.* v. *Canal Board*, 204 N. Y. 471).   Equity and honor are the same as in olden days.   The Constitution does not define them, nor seek to circumscribe their content. An employee in a state hospital was injured by the assault of a patient confided to his care (*Munro* v. *State of N. Y.*,

223 N. Y. 208).   A statute after the event declared that upon a finding by the Court of Claims that the injuries " were so sustained," damages therefor should " constitute a legal and valid claim against the state."   We held that the right to reparation was so rooted in equity and fairness that the legislature was free to recognize it by assuming liability.   We did not put our decision, as the legislature did not base the statute, upon any theory of negligence in the conduct of the enterprise.   The claimant had been injured by an " unforeseen accident " (p. 216) as the result of service to the state, and that was thought enough, though the state was not at fault.   If a hospital attendant, serving in times of peace, has a moral claim to be indemnified against the risks of an employment which he was free to accept or to reject, the soldier injured in a war has at least an equal equity.   I cannot doubt that under *Munro* v. *State of N. Y.* (*supra*), a bonus or pension to the maimed or incapacitated would be the recognition and fulfillment of a moral obligation, and not a largess or donation, the dole of charity or benevolence. The conscience of the state would listen with little patience to the argument that wounded and disabled had no claim upon its bounty because wounds and disabilities were suffered in the service of the nation.   This the prevailing opinion apparently concedes, though I cannot reconcile the concession with the logic of its theorem.   Relief in such circumstances would not rest upon the narrow ground that the injured or disabled might be in danger of becoming paupers.   It would be due, if so the legislature should read the promptings of morality, though all were self-supporting.   Aid to men thus stricken is not benevolence to the poor.   It is an attempt, however feeble, with sacrifice outweighing payment, to set the balance true.

If the account may be recast by adjusting recompense to suffering when the disparity disturbs the conscience, it

[231 N. Y. 465]   Dissenting opinion, per CARDOZO, J.          [Aug.,

is for the legislature to declare when conscience is disturbed. Not this form of sacrifice or that to the exclusion of another, but merely sacrifice unrequited, is the basis of its power. I cannot say that there is an equity in unrequited wounds, and none in other suffering of body or of mind. The grip is, indeed, weaker, and yet it can be felt. I cannot say, if there is an equity in suffering of body or of mind, that there is none in economic suffering, the loss of money or money's worth. Few would doubt this if the soldiers had received no pay at all. Pay so inadequate as to be almost nominal does not greatly change the balance. A has saved the life of B, or of B's child, and in so doing has suffered loss. Many a man in B's case would feel that the loss should be repaired. We deal here with a like service, not of one man, but of an army. " That which would have been merely a charity or a gift is not such by reason of the service given, the consideration rendered, the honorable obligation incurred " (*Trustees Exempt Firemen's Benev. Fund* v. *Roome,* 93 N. Y. 326). We err when we envisage the soldier's relation to the government in the category of contract. Contract in the true sense there is none, but service conscripted by the sovereign, and, even though not conscripted, rewarded at its will. That is why payment of the wage does not always satisfy the conscience that there has been payment of the debt. The Constitution does not silence these mutterings of spiritual disquiet when sacrifice unevenly distributed oppresses those who profit by it with the sense of a burden undischarged. Our ruling in *Matter of Borup* (182 N. Y. 222) was founded in that truth. We held that it was in the power of the legislature by a retroactive statute to assume liability to a landowner injured by a change of grade, though at the time of the change the impairment of value was damage without wrong. Under the law before the statute, the loss was one of the incidents of life in organized society.

It was part of the price which the citizen must pay for the benefits of government. We held that the legislature might readjust the incidence of the burden, might establish a more equitable distribution between the individual and the public, through the voluntary acceptance of liability for a loss which was without a remedy when suffered. I cannot yield to an appraisal of values that would find the basis of an equity there, and a mere cobweb, an illusion, here. In neither case is there legal liability unless the legislature assumes one. In each there is an unequal pressure of the burdens and the power of government upon one man and upon others. The readjustment of these burdens along the lines of equality and equity is a legitimate function of the state as long as justice to its citizens remains its chief concern (*Oswego & Syracuse R. R. Co.* v. *State of N. Y.*, 226 N. Y. 351).

I am led, therefore, to the conclusion that the payment of this bonus, as money earned, but not received, is not wholly without support in something which the legislature might estimate as a moral or honorary obligation. If there is any reasonable basis for such an estimate, for such a conception of equity and justice, the courts must yield to the judgment of the legislature that it is worthy of recognition. The question is then one that the legislature must determine for itself (*U. S.* v. *Realty Co.*, 163 U. S. 427, 444; *Oswego & Syracuse R. R. Co.* v. *State of N. Y. supra*, at p. 357). " Its decision * * * can rarely, if ever, be the subject of review by the judicial branch of the government " (*U. S.* v. *Realty Co.*, *supra;* cf. *Opinion of the Justices*, 175 Mass. 599, at p. 602). Some may think the service so far beyond requital that the attempt should be surrendered for mere futility. Others may think that high and unselfish sacrifice is cheapened when repaid in money. Others again may think that for the sake of the economic or financial stability of the commonwealth, losses already

suffered should be left to lie where they have fallen. These are questions of political or legislative expediency. I make no attempt to answer them. I am not to substitute my judgment for the judgment of the lawmakers. The act, moreover, was either valid or invalid at the date of its enactment. Its validity cannot turn upon the hope or expectation that aid, at some indefinite period hereafter, may be granted by the nation. Impressive is the list of like statutes to be found in other states (California, Connecticut, Maine, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Hampshire, North Dakota, Oregon, Rhode Island, South Dakota, Vermont, Washington, Wisconsin and Wyoming) as well as in foreign countries (Italy, France, Great Britain, Canada and Australia). Impressive too is the vote in favor of our own statute, when submitted to the electors. I cannot bring myself to believe that all these concurring acts were unmoved by any conception of honor or of duty, or that the conception, if held, had no basis in reality. If there be the possibility of conflicting motives, those that vitiate are to be rejected, and those that validate presumed.

We are warned that the recognition of this equity may be followed by the recognition of others still weaker and more rarefied. All sorts of hypothetical situations are suggested in the briefs of counsel, and held before us *in terrorem*. I am not swerved by these forebodings. I do not know the equity that is incapable of being reduced to an absurdity when extended by some process of analogy to varying conditions. Here, as often in the law, the difference between right and wrong is a difference of degree. Most of these imaginary problems will never in fact arise. They assume a legislature and an electorate without responsibility or conscience. The public credit is not pledged in these cases by the legislature alone. The pledge is invalid unless ratified by the vote of the

electors (Const. art. VII, sec. 4).   I find little opportunity here for the charlatan or the cheat.   Something more than a bizarre and shadowy pretense, some service stirring the deep currents of public gratitude and loyalty, will be needed before these protecting dykes and dams are overcome and flooded.   But the existence of a power is not refuted by demonstrating the opportunity for its abuse. The abuse must be dealt with when it arises (*Opinion of the Justices*, 175 Mass. 599, at p. 602).   We may not nullify a statute from mere mistrust of the capacity of legislature and people to use their power wisely.   I am persuaded that hundreds of thousands of earnest men and women believe that justice and equity demand the payment of this bonus.   They may be wrong.   I do not know. It is enough that I cannot characterize their belief as a vagary of the mind, an idle dream or phantasy, an irrational pretense.

None of the previous cases in this state controls the case before us.   *Bush* v. *Board of Supervisors Orange Co.* (159 N. Y. 212) is not decisive.   The claim of drafted men or of those who had hired a substitute that they should receive, many years after the civil war, a bounty equal to that paid as a reward for volunteering, had small support in morals (cf. *Opinion of the Justices*, 190 Mass. 611; *Opinion of the Justices*, 211 id. 608).   That decision, moreover, could stand on the single ground that the debt, contracted by a county, was not one for county purposes, and that there was surely no moral obligation resting on the county, even though upon some strained theory we might ascribe one to the state.   The *Mahon* case (*Matter of Mahon* v. *Bd. of Education N. Y. City*, 171 N. Y. 263) does not control, for the teachers were servants of the municipality, who had made a voluntary contract, and the Constitution prohibits the grant of extra compensation to public officers, servants, agents or contractors of the state, or of its civil subdivisions (Art. III, sec. 28).   That provision is inappli-

cable here, for it postulates a contract to which the state or the municipality was a party, and not submission to a mandate, issued by another agency of government, where volition is excluded.  What was said in the other cases, so far as it is applicable here, was *obiter*.  We may even assume in accordance with the rather sweeping dictum of Cullen, Ch. J., that there is no longer room for the play of mere gratitude and charity (*Lehigh Valley R. R. Co.* v. *Canal Bd.*, 204 N. Y. 471).  The dictum is coupled with the concession that room there still is for the recognition of the claims of equity and justice (pp. 475, 476). *Trustees of Exempt Firemen's Benev. Fund* v. `Roome` (93 N. Y. 313) and *Munro* v. *State of N. Y.* (223 N. Y. 208) show how plastic and comprehensive is the. content of those terms.  There is a difference, not to be ignored, between profit and indemnity.  If the soldiers had. not suffered, and the sole purpose of the bonus were to reward them above others, the reward might be said to have no basis except gratitude, a free offering of thanksgiving, untouched by the admixture of any sentiment of justice.  Their service has been coupled with sacrifice, and from the union of the two there is born the equity that prompts to reparation.

The judgment should be affirmed with costs.

Pound, J. (dissenting).  The New York Constitution, article VII, section 1, provides: " The credit of the State shall not in any manner be given or loaned to or in aid of any individual, association or corporation."  I am unable to agree with my associates that this limitation prohibits the creation of a debt upon submission to the people, pursuant to article VII, section 4, for the purpose of raising money to pay soldiers' bonuses or for any other public purpose which is to be carried out by the state itself without the intervening agency of an individual, association or corporation.

The credit of the state is not given to or in aid of the recipients of the state's bounty under chapter 872, Laws of 1920. It is not given or loaned " in any manner." It is sold in the market to the purchasers of the bonds. The borrowed money becomes the money of the state and is held subject to the provisions of article VIII, section 9. It may not be given " to or in aid of any   *   *   *   private undertaking." Except for such limitation, it may be given to individuals for any public purpose " in pursuance of an appropriation by law," but not otherwise.   (Const. art. 3, § 21.)

The payment of soldiers' bonuses is or may be recognized as being for a public purpose and a public undertaking. The purpose and the undertaking are to supplement the pay of the soldiers and thereby to promote military zeal in the future. Whether the sense of gratitude or the sense of obligation prevailed with the legislature and the people as the impulse of the legislation; whether the bonus is to be regarded as alms or honorarium, thus becomes a matter of indifference to the court. What to one seems an act of gratitude becomes to another the recognition of an equity. But the state may borrow money for its public purposes whether moved thereto by benevolence or by moral constraint, so long as no association, corporation or private undertaking acting as a *quasi* state agency receives the money or is thereby aided.

I vote to affirm.

HISCOCK, Ch. J., HOGAN, McLAUGHLIN and CRANE, JJ., concur with ANDREWS, J.; CARDOZO and POUND, JJ., each read a dissenting opinion.

Judgment reversed, etc.