22 N.Y.2d 119 (1968)
Saratoga Harness Racing Association, Inc., Appellant,
v.
Agriculture and New York State Horse Breeding Development Fund, Respondent.
Court of Appeals of the State of New York.
Argued February 20, 1968.
Decided May 16, 1968.
Ernest B. Morris and David W. Morris for appellant.
Louis J. Lefkowitz, Attorney-General (Edward Siegfried and Ruth Kessler Toch of counsel), for respondent.
Judges BURKE, SCILEPPI and BERGAN concur with Judge KEATING; Judge BREITEL dissents and votes to reverse in an opinion in which Chief Judge FULD and Judge JASEN concur.
*121 KEATING, J.
This appeal presents for our consideration an attack upon the constitutionality of a legislative program enacted to aid the growth and development of a business enterprise  harness racing tracks and related operations  which provides substantial revenues to the State and its subdivisions and which the Legislature has found constitute "an important part of the economy of the state" (L. 1965, ch. 567, § 1).
The legislation in question created the Agriculture and New York State Horse Breeding Development Fund as a body corporate and politic constituting a public benefit corporation "within the state harness racing commission" (Pari-Mutuel Revenue Law, § 55-a, as added by L. 1965, ch. 567). The fund is administered by the Commissioner of Agriculture and Markets, the Chairman of the Harness Racing Commission and three trustees appointed by the Governor. The fund derives its revenues from private racing associations which are required to pay to it 25% of the "breaks" ("odd cents over any multiple of ten calculated on the basis of one dollar and otherwise payable *122 to a patron"). The fund is authorized to deposit the moneys received in several segregated accounts and to disburse them for various programs designed to foster the continued growth and prosperity of the industry.[*]
The plaintiff-appellant, the Saratoga Harness Racing Association, Inc., a licensed private horse-racing corporation, has commenced this action to enjoin the fund from collecting some $45,222.89 of "breakage" moneys, held by the association. The association urges that the legislative program outlined above violates article I (§ 9, subd. 1) and the provisions of article VII (§ 7) of the New York State Constitution.
We agree with both courts below that this contention is without merit.
Section 9 of article I of the Constitution creates an exception to the constitutional prohibition of gambling and permits pari-mutuel betting on horse races "as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government". The revenues required to be turned over to the fund, the association argues, will not be expended for "the support of government" and, therefore, the statute is unconstitutional.
The association's contention is premised upon an erroneous reading of the constitutional provision. Exclusive of the 25% of "breakage" involved here, harness racing is a source of substantial revenue (50% of the "breakage") for the support of government. There is nothing in the amendment which requires that all revenue in excess of expenses be devoted to the direct support of government or which prohibits the Legislature, as a condition to granting a license to a private racing association, *123 from requiring that a certain portion of the revenues derived from racing be set aside for the general improvement of the sport and the facilities used. The Agriculture and New York State Horse Breeding Fund is the instrument through which the Legislature has chosen to effectuate this legitimate public interest and purpose. We perceive no constitutional impediment arising out of section 9 of article I which requires that this legislative scheme be struck down.
The argument advanced by the association with regard to section 7 of article VII is likewise without merit. This provides that "No money shall ever be paid out of the state treasury or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made within two years next after the passage of such appropriation act; and every such law making a new appropriation or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object or purpose to which it is to be applied; and it shall not be sufficient for such law to refer to any other law to fix such sum."
The association argues that the revenues collected by the fund constitute a fund under the management of the State and that, since expenditures may be authorized by the members of the fund "without control by the State's budgetary and legislative process," there is present "a clear violation of the foregoing constitutional requirement."
We shall assume for the purpose of determining the merits of this argument that the association has standing to attack, in a proceeding such as this, the validity of expenditures made by the fund (see, generally, St. Clair v. Yonkers Raceway, 13 N Y 2d 72, cert. den. 375 U. S. 970; Schieffelin v. Komfort, 212 N.Y. 520).
An analysis of the purpose sought to be vindicated by section 7 of article VII leads us to the conclusion that the Agriculture and New York Horse Breeding Development Fund is not a fund under the management of the State as that term is employed in the Constitution. Clearly, as we have held, not every fund made up of public moneys raised through taxation or otherwise comes within the purview of section 7 of article VII (Matter of Clark v. Sheldon, 106 N.Y. 104; People ex rel. Evans v. Chapin, 101 N.Y. 682). Whether a fund, not directly held or managed by *124 the State but by a public benefit corporation, comes within the purview of the constitutional provision should be determined by an examination of the purposes sought to be attained by it.
The history of section 7 of article VII indicates that it was motivated by a concern that, absent legislative control over expenditures, it was possible for the State to incur obligations in excess of its actual income and thus "leave burthens for the future, and severe taxation or repudiation, the meanest of all things". (2 Lincoln, Constitutional History of New York, p. 183.)
The legislation with which we are concerned in this case created a corporate entity whose obligations do not become the obligation of the State and, indeed, whose expenditures are effectively limited to income (Pari-Mutuel Revenue Law, § 55-c, subds. 1, 2). Moreover, there is no possibility, as the dissenting opinion suggests (p. 130), that "public visibility of legislative control over the raising of revenues and their disbursement" will be endangered. The legislation specifically provides the method of raising revenue and specifically defines what proportion of the funds actually collected are to be allocated for the various programs designed to further the legislative purpose (Pari-Mutuel Revenue Law, § 55-c, subd. 1). In essence all that is left to the "Fund" is the administration of the expenditures in accordance with the legislative mandate.
To strike this legislation down would needlessly hamper and cripple a significant legislative program. Such a result is not mandated by the language, purpose or spirit of section 7 of article VII of the Constitution.
We have examined the remaining arguments advanced by the association and find them to be without merit.
The order of the Appellate Division should be affirmed, with costs.
BREITEL, J. (dissenting).
This action was brought by the Saratoga Harness Racing Association, a licensed private pari-mutuel horse-racing corporation, to enjoin attempts by defendant Agriculture and New York State Horse Breeding Development Fund to collect $45,222.89 of "breakage" moneys, held by the association. Defendant Breeding Fund claims a right to these moneys under article III of the Pari-Mutuel Revenue Law (as added by L. 1965, ch. 567). This law provides that 25% of *125 all "breaks" ("odd cents over any multiple of ten calculated on the basis of one dollar and otherwise payable to a patron") are to be paid by racing associations to the fund, a public benefit corporation created within the State Harness Racing Commission. Plaintiff association appeals from an order of the Appellate Division, Third Department, which unanimously modified an order of the Supreme Court, Saratoga County. The Supreme Court had denied plaintiff's motion for summary judgment and had granted defendant's cross motion, on a counterclaim to recover the breakage held by the association, to the extent of $24,706.83. The Appellate Division, in a Per Curiam opinion, modified the order to allow defendant fund full recovery on its counterclaim, in the sum of $45,222.89.
Two issues are presented on this appeal. First, whether plaintiff association was obligated to pay to defendant fund 25% of the breakage moneys collected during the calendar year 1965, when the fund was established, even though three members of the fund were not appointed until 1966. Second, whether the statutory scheme violates section 9 of article I or section 7 of article VII of the State Constitution. Because the statute violates section 7 of article VII of the State Constitution, which forbids the payment of State funds except pursuant to an appropriation by law, plaintiff association should be under no obligation to pay the breakage money to defendant fund.
A brief outline of the successive constitutional and legislative enactments should facilitate analysis of the issues raised. In 1939, section 9 of article I of the State Constitution was amended to permit "pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government". Between 1940 and 1956, the enabling statute under this constitutional enactment provided for a division of the betting pool between bettors, the track and the State (L. 1940, ch. 254). In 1956, faced with the need for modernized track facilities, the Legislature amended the enabling act (L. 1956, ch. 837; see Matter of Blaikie, 11 A D 2d 196). Under the amended statute, the sum to be received by the State and track was increased by the amount of the "breaks" ("odd cents over any multiple of five"). In addition, part of the State's share was to be paid into a "construction account" from which tracks were to be *126 reimbursed for capital improvements (Matter of Blaikie, 11 A D 2d 196, 198, supra).
In 1965, the enabling act was further amended to compute the "breaks" on the basis of multiples of 10 rather than 5 cents. Additionally, the defendant fund was created as a body corporate and politic constituting a public benefit corporation "within the [State] harness racing commission" (Pari-Mutuel Revenue Law, § 55-a, as added by L. 1965, ch. 567, eff. July 2, 1965). The fund is administered by the Commissioner of Agriculture and Markets, the Chairman of the Harness Racing Commission and three trustees appointed by the Governor. Under the statute, racing associations are to pay to the fund 25% of the breaks which they collect. The fund, in turn, is authorized to deposit the moneys received in several segregated bank accounts, and to disburse them for a number of purposes: reimbursement of capital improvements and repairs by tracks; sponsoring of horse-breeding programs; and promotion of "New York state bred harness horse events."[1] These disbursements are not conditioned upon legislative appropriations, nor does the statute provide expressly for pre-audit by the Comptroller.
Turning first to the statutory ground raised by plaintiff association, it contends that since the administrators of the fund were not appointed until January of 1966, the fund was in no position to "collect and receive" the breaks in 1965. It argues, therefore, that the association had no concomitant duty to retain the breaks for later payment to the fund. This contention is untenable, however, in light of other provisions of the statute. The act provides that it shall "take effect immediately [July *127 2, 1965] and shall apply to all pari-mutuel betting conducted on and after the first Monday [July 5, 1965] after it takes effect" (L. 1965, ch. 567, § 10). It also provides that "There is hereby created within the harness racing commission the `agriculture and New York state horse breeding development fund'" (Pari-Mutuel Revenue Law, § 55-a). Thus, the corporate entity having come into existence, it was competent, in law, to receive property, regardless of the fact that the human agents necessary for it to act had not yet been appointed. While it lacked the human agents to implement its acquisition of property, the right to receive property required no activity on its part, by the sheer command of the statute creating it. Consequently, the obligations of racing associations to collect and pay 25% of the breaks to the fund arose at that time, and did not await the appointment of the fund members. In any event, the fund had two members initially by reason of the ex officio status of the Commissioner of Agriculture and Markets and the Chairman of the Harness Racing Commission.
Turning to the constitutional questions raised, the fund contends that it is a State agency and its share of the breakage is a derivation of "reasonable revenue for the support of government". It also argues that the authorized disbursements from its share of the breakage are for public purposes. Hence, it argues that the statute creating it is not unconstitutional under section 9 of article I conditioning pari-mutuel betting on horse races on the derivation of reasonable revenues for the support of government. The fund's contentions are correct. The fund is created "within the state harness racing commission", as already noted, and the various classes of disbursements relate to public purposes, namely, the fostering of horse breeding in the State, and activities associated with horse breeding, including the revenue-producing opportunities of horse racing. Moreover, the receipts are to be distributed to various agencies, public and private, rendering services to the public. Having made this successful contention, the fund is impaled on the other horn of a constitutional dilemma. Plaintiff association contends that if the fund is a State agency receiving and disbursing State revenues, the legislative scheme, permitting disbursement without appropriation, violates section 7 of article *128 VII of the State Constitution: "No money shall ever be paid out of the state treasury or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made within two years next after the passage of such appropriation act; and every such law making a new appropriation or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object or purpose to which it is to be applied; and it shall not be sufficient for such law to refer to any other law to fix such sum."
The threshold question, of course, is the association's standing to raise this contention. Under the Appellate Division's order, the association would be compelled to pay $45,222.89 to the fund. Yet, if the association's contention is well founded, disbursement of these moneys by the fund would be unconstitutional. The statutory direction to the association to pay the breaks to the fund cannot survive a finding that payments out of the fund are unconstitutional, since the Legislature could not and did not intend moneys to accumulate in the fund for no purpose. Indeed, taxation is valid only for public purposes and taxation for no purpose would be unconstitutional (see Matter of Roosevelt Raceway v. Monaghan, 9 N Y 2d 293, 312 [DYE, J., concurring]; People v. Westchester County Nat. Bank, 231 N.Y. 465, 470). If the association's obligation to pay is thus nullified, in view of the invalidity of the statutory scheme, the association has standing to raise this constitutional contention. Its interest is immediate and visible. It is directly affected by the invalid statutory scheme, unlike the general taxpayer whose interests are only remotely affected by unlawful payments from the general fund in the State treasury (Matter of Mastrangelo v. State Council of Parks, 21 A D 2d 879, mot. for lv. to app. den. 15 N Y 2d 482; see, also, Doremus v. Board of Educ., 342 U. S. 429, 433; Massachusetts v. Mellon, 262 U. S. 447, 487).
Consequently, plaintiff's standing should be recognized, in sharp distinction from the result required by the settled rule barring suits by mere taxpayers whose interest in the proceeding is undifferentiated from that of the public at large (cf. St. Clair v. Yonkers Raceway, 13 N Y 2d 72, cert. den. 375 U. S. 970 [bettor has no standing to compel diversion of part of his $18 wager from track to State on ground that 1956 statute *129 increasing percentage retained by track is unconstitutional]). Thus, in the St. Clair case (supra, p. 76), this court quoted with approval from Schieffelin v. Komfort (212 N.Y. 520, 537) "`that the courts of this state have denied the right of a citizen and taxpayer to bring before the court for review the acts of another department of government simply because he is one of many such citizens and taxpayers'". In this case, of course, the association is not one of many but the direct payer of a tax raised for a special purpose and invalidly imposed. None of the relevant cases in which a lack of standing has thus far precluded a plaintiff from relief has ever been applied to such a direct taxpayer, especially when it is required to contribute to a special purpose fund as is involved in this case. The difference is decisive.
Turning to the merits of the association's constitutional contention, the critical issue is whether the breaks to be paid to the fund are moneys subject to the provisions of section 7 of article VII. The fund concedes, as the Appellate Division found, that it is "an integral part of State government". It contends, however, that the restrictions of section 7 of article VII apply only to moneys on deposit in the State treasury.
The language of the constitutional provision does not permit this narrow interpretation. The section provides that no money shall ever be paid "out of the state treasury or any of its funds, or any of the funds under its management" except upon legislative appropriation (see Matter of Roosevelt Raceway v. Monaghan, 9 N Y 2d 293, 313, supra [DYE, J., concurring]; Switzer v. Commissioners for Loaning Certain Moneys, 134 App. Div. 487, 490; 1917 Opns. Atty.-Gen. 175, 181-186). The breakage moneys to be held by the fund are in fact and in law funds under the management of the State within the meaning of this section. The fund itself is, indeed, an integral part of a State agency. Two of its members are heads of State agencies; the other three are appointed by the Governor. The fund is charged with the performance of public duties, in fulfillment of the requirement of section 9 of article I of the Constitution that pari-mutuel betting provide a "reasonable revenue for the support of government". In light of all these facts it is concluded that the breakage moneys come within the provisions of section 7 of article VII.
*130 Since the statutory scheme envisions disbursement of these funds without appropriation, it represents an unlawful attempt to evade the constitutional controls upon State finances.[2] Control by the Legislature through regular appropriation, restrictions on the Legislature to make current appropriations only on a two-year basis at the outside, the public visibility of legislative control over the raising of revenues and their disbursement, and the executive-legislative balancing of the budget are objectives of the highest importance in State government, sought and achieved through a long historical and constitutional development. (See Matter of Kings County Light. Co. v. Maltbie, 244 App. Div. 475, 479-480 [dictum]; Switzer v. Commissioners for Loaning Certain Moneys, 134 App. Div. 487, 490, supra; People ex rel. Western Union Tel. Co. v. Roberts, 30 App. Div. 78, 80, affd. 156 N.Y. 693; 1917 Opns. Atty.-Gen. 175, 181-186; cf. Matter of Roosevelt Raceway v. Monaghan; 9 N Y 2d 293, 311-315, supra [DYE, J. concurring] [construing art. VII, § 8, forbidding the giving or lending of "money of the state" to a private corporation, association or undertaking]; People v. Tremaine, 252 N.Y. 27, 38 [dictum]; Fox v. Mohawk & Hudson Riv. Humane Soc., 165 N.Y. 517, 523-524 [construing art. VII, § 8]; American S. P. C. A. v. City of New York, 205 App. Div. 335, 339-340 [construing art. VII, § 8]; 2 Lincoln, Constitutional History of New York, pp. 182-184; but cf. Matter of Clark v. Sheldon, 106 N.Y. 104, 112 [taxes paid to and held by the county treasurer never became State funds]; People ex rel. Evans v. Chapin, 101 N.Y. 682 [moneys paid into State treasury by administrator of estate pursuant to then Code Civ. Pro., § 2747, because beneficiaries were unknown, were not State funds]; Matter of Blaikie, 11 A D 2d 196, supra; Wickham v. Trapani, 41 Misc 2d 749, 755-756, affd. 26 A D 2d 216.)
Accordingly, I dissent and vote to reverse the order of the *131 Appellate Division and remit the matter to Special Term for entry of summary judgment in favor of plaintiff.
Order affirmed.
NOTES
[*] Section 55-c (subd. 1) provides for the distribution as follows:

"(a) Two and one-half per cent thereof in an account designated `administration'.
"(b) Two per cent thereof, in an account designated `4-H standard bred development program'.
"(c) Three per cent thereof in an account designated `New York state exposition horse facility maintenance and construction'.
"(d) Seven and one-half per cent thereof in an account designated `New York state exposition breeding farms.'
"(e) Ten per cent thereof in an account designated `county and town agricultural societies'.
"(f) Seventy-five per cent thereof in an account designated `New York state breeding farms'."
[1] Section 55-c (subd. 1) provides for the distribution as follows:

"(a) Two and one-half per cent thereof in an account designated `administration'.
"(b) Two per cent thereof, in an account designated `4-H standard bred development program'.
"(c) Three per cent thereof in an account designated `New York state exposition horse facility maintenance and construction'.
"(d) Seven and one-half per cent thereof in an account designated `New York state exposition breeding farms.'
"(e) Ten per cent thereof in an account designated `county and town agricultural societies'.
"(f) Seventy-five per cent thereof in an account designated `New York state breeding farms'."
[2] An issue not raised in this case is whether racing associations may continue to retain breaks to a multiple of 10 rather than 5 cents, despite the invalidity of the statutory scheme. It would seem, however, that the part of the 1965 act increasing the breakage could be severed from the remainder (see L. 1965, ch. 567, § 9). This is not to say that the Legislature would not be able to adopt a retroactive statute reaching that percentage of the breakage collected in the past which would have been paid to the fund but for the invalidity of the present scheme, if the court were to so hold.